820 So.2d 571 (2002)
STATE of Louisiana
v.
Gerry O. ROBINSON.
No. 2001-KA-1305.
Court of Appeal of Louisiana, Fourth Circuit.
April 17, 2002.
*573 Harry F. Connick, District Attorney, Juliet Clark, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Doris Bobadilla, Galloway, Johnson, Tompkins, Burr & Smith, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge MIRIAM G. WALTZER, Judge MICHAEL E. KIRBY).
BYRNES, Chief Judge.
Defendant Gerry Robinson was charged by grand jury indictment on September 2, 1993 with two counts of first degree murder. Defendant pleaded not guilty at his October 20, 1993 arraignment. The trial court denied defendant's motion to suppress the identification on August 15, 1994. On January 25, 1996, at the close of a three-day trial, defendant was found guilty by a twelve-person jury of two counts of second degree murder. On March 5, 1996, defendant was sentenced to life imprisonment at hard labor, without benefit of probation, parole or suspension of sentence. On the same day the trial court granted defendant's motion for appeal. This court affirmed defendant's conviction in an unpublished errors patent decision on November 26, 1997, remanding the case to the trial court for clarification of the sentence and sentencing on count two.[1] The Louisiana Supreme Court denied writs.[2] On May 4, 1998, defendant was resentenced to life imprisonment at hard labor on each count, without benefit of probation, parole or suspension of sentence, both sentences to run concurrently. On April 10, 2000, this Court granted defendant's writ application, reversed the trial court's denial of his application for post conviction relief, and ordered the trial court to grant defendant an out-of-time appeal.[3]
The following facts are taken from this court's original unpublished decision:
Officer Karen Woods and her partners, Officers Demma and Williams, answered a call to 1419½ Milton Street on July 7, 1993. Once there, she found the front door locked, and she got no response to her knock. One of her partners climbed in through a front window; because the front door was locked with a dead-lock bolt, the officers had to kick in the door in order to enter the apartment. There they found three people who had been shot; onea womanwas dead, and two men, who were still living, were taken to Charity Hospital where one of the men died. Carla Whitfield, the resident of the apartment, gave a statement to Officer Woods.
Dr. Susan Garcia, the pathologist who performed the autopsies and an expert in forensic pathology, testified that Willie Nabonne, the nineteen-year-old victim, suffered fourteen gunshot wounds. Three of those wounds were lethal. Willie Nabonne had a blood alcohol level of .01, but he had no illicit drugs in his *574 system. Dr. Garcia also autopsied Danielle Brown, the sixteen-year-old victim, who suffered eleven gunshot wounds; one to the back of her head and one to her chest were lethal. Canabanoids were found in Danielle Brown's system.
Sergeant Larry Nettles of the crime lab testified that he responded to the call to 1419½ Milton Street on July 7, 1993. At that location he found twenty-seven .9 millimeter casings; he determined that twenty-four of the casings came from the same weapon. Most of the casings were found within the apartment and a few outside. He also found a .45 caliber gun in the kitchen and three .45 casings.
Officer James Charles Eaton investigated the homicides. When he arrived on the scene, he saw the body of a woman on the kitchen floor and the kitchen covered with blood. There were bullet casings on the sink, the stove, and all over the kitchen floor. Eaton also found a semi-automatic handgun near the body in the kitchen. Officer Eaton took a statement from Carla Whitfield. Based on information she gave him, the officer prepared a photographic line-up, and Ms. Whitfield selected the defendant's picture.
Sergeant Rodney Bailey of the homicide division conducted a follow-up investigation of the deaths of Danielle Brown and Willie Nabonne. Sergeant Bailey met with Jeffrey Hughes who survived the gunfire in the apartment. Jeffrey Hughes identified the defendant as the man with the assault gun who shot him, Brown, and Nabonne.
Carla Whitfield testified that the defendant is the father of her daughter who was four at the time of the incident. She gave the following version of the facts. On July 5, 1993, the defendant and his uncle came to her house. She, Jeffrey Hughes, Danielle Brown, and Willie Nabonne were present. The defendant asked Jeffery Hughes if he were involved with Ms. Whitfield. Then Hughes and the defendant began fighting, and Willie Nabonne began shooting at the defendant's uncle. At some point Jeffery Hughes had the gun and used it to hit the defendant in the head. Later in the scuffle, the defendant said to his uncle, "Go run and get the gun out the car." However, the incident ended abruptly because Ms. Whitfield pushed the defendant out the front door; Whitfield and Danielle Brown insisted the other men leave by the back door. As he was leaving, the defendant threatened to "come and kill all of us." Early in the morning of July 7, 1993, Ms. Whitfield saw the defendant beating on the window and then heard him at the back door. Whitfield's daughter was with her as well as Hughes, Brown, and Nabonne. Whitfield began looking for the door key because the dead-bolt was locked; however, she could not find it. Shortly thereafter, she heard the defendant breaking the window, and she immediately put her child in the closet and ran into the bathroom herself.
Jeffrey Hughes, who was twenty-three at the time of trial, testified that he was at Carla Whitfield's apartment on July 5, 1993, when the defendant arrived. The defendant became angry that Hughes was in the house and began fighting with him. Hughes admitted grabbing a gun and hitting the defendant on the head with it during the fight. Hughes left the apartment that night but returned on the evening of July 6, 1993, and spent the night. Hughes awoke on July 7, 1993 to the sound of screaming. He went into the kitchen to see Willie Nabonne and Danielle Brown trying to pry the door open with a knife. When Hughes asked what they were doing, they answered, "Some *575 dude is in the house trying to kill us." Willie Nabonne was holding a gun which he said had three bullets in it. Then the defendant entered the kitchen, turned toward Hughes, and said, "Now nigger, I got you"; he began shooting. Jeffery Hughes was shot eleven times. Hughes remembers Willie Nabonne asking him to go for help, but Hughes could not move. Hughes spent two months in the hospital recovering from his gunshot wounds.
Janice Chandler Molere, whose apartment is near that of Carla Whitfield, testified that on July 7, 1993, as she was saying goodby to her husband at 6:40 a.m., she heard gunshots. She was in her kitchen a few minutes later when she saw a man come around the building and reload an automatic revolver. Ms. Molere said she watched the man "enter a backdoor and gunshots went off." About a week later Molere noticed Detective Bailey near her apartment and she told him what she had seen.
Monique Ravey, the defendant's aunt, testified that she took her nephew to Tulane Medical Center in July of 1993 because he had a gunshot wound in his arm. He was treated and released the same day.
Ricardo Samuel Ravey, the nineteen-year-old uncle of the defendant, testified that he and the defendant caught the bus to Carla Whitfield's apartment on July 5, 1993, in order to pick up the defendant's daughter. Once there, the defendant and Jeffrey Hughes began fighting, and the defendant asked Samuel to go to get help. The defendant did not instruct him to get a gun, Samuel Ravey explained, because they did not have a gun or a car in which to conceal a gun. As Ravey ran for help, Willie Nabonne began shooting at him.
Charlene Robinson, the mother of the defendant, testified that her son and Carla Whitfield had a five year relationship in 1993. The defendant supported his daughter financially, and Ms. Robinson kept the child for two or three years. Ms. Robinson said that her son never had a weapon in 1993.
Gerry Robinson, who was twenty-four at the time of trial, testified that he turned himself in to the police on July 9, 1993. When his daughter was born in 1989, Robinson quit school to take a job so as to support her, he said, and he was working two jobs in 1993. On July 5, 1993, about 8:30 p.m., he went to Carla's to pick up the child, but Carla refused to let the child leave with him. Jeffery Hughes, Danielle Brown, and Willie Nabonne were in the living room. An angry exchange of words between the defendant and Hughes led to a fight. During the tussle, Hughes hit him on the head with a gun more than once. The defendant called to his uncle, who had accompanied him, to run for help. Nabonne followed Sam and shot at him several times. The defendant left the apartment and called 911; when the police officer came, the defendant could not tell him the names of the people in the apartment other than Carla Whitfield, and so the defendant decided not to file a report about the incident. On July 6, 1993, the defendant spoke to Carla on the telephone, and she reassured him that he could get his daughter anytime he wanted. On July 7, 1993, the defendant armed himself before going to Carla's because he was frightened. He said he did not know what kind of gun he had, but everyone called it an "uzi" or a "mac-10." He had no intent to kill anyone there, he stated. When he arrived at the apartment, he tapped on the windows and kicked the door to awaken Carla. Because she did *576 not answer, he entered through the bedroom window. He was standing between the kitchen and living room when he noticed shadows, and shortly thereafter he was shot in the arm. He panicked, grabbed his gun and began shooting at the shadows. Gerry Robinson said his .9 millimeter gun holds twenty-five bullets. He denied reloading it. When he was treated for his gunshot wound at Tulane Medical Center, he told the attendants there that he was robbed in the Fischer Housing Project.

ERRORS PATENT & ASSIGNMENT OF ERROR NO. 7
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1
In this assignment of error, defendant argues that the evidence was insufficient to support his conviction. Specifically, defendant argues that no rational trier of fact could have concluded that he had the requisite specific intent.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Ragas at pp. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
Defendant was convicted of second degree murder, defined in pertinent part by La. R.S. 14:30.1 as the killing of a human *577 being when the offender has a specific intent to kill or inflict great bodily harm.
Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as fact, but may be inferred from the circumstances and actions of the defendant. State v. Hebert, XXXX-XXXX, p. 12 (La.App. 4 Cir. 4/11/01), 787 So.2d 1041, 1050. Specific intent can be formed in an instant. State v. Cousan, 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390.
Defendant claims that on the night of July 7, 1993, he fired his twenty-five shot 9mm firearm into the kitchen not with the specific intent to kill or inflict great bodily harm, but rather "as a response to the earlier beating and fear, as well as in response to the bullet that ripped through his arm." Defendant admitted that on the night of the shooting he entered Carla Whitfield's residence through a window, saying he did so because no one had answered his kicks at the door or his taps on the window. Defendant admitted that at the time he entered the residence he was armed with a 9mm firearm equipped with a twenty-five round magazine. He claims that he went to the residence simply to pick up his daughter from her mother, Ms. Whitfield. Defendant claimed that he armed himself because of fear engendered in him by an incident two nights earlier, on July 5, when he was beaten with a gun by Jeffrey Hughes, a romantic interest of Ms. Whitfield's, and Willie Nabonne shot at his uncle.
All witnesses agreed that there was an altercation at Ms. Whitfield's residence on July 5. Defendant represents that all witnesses agreed on the events of that night. However, defendant testified that Jeffrey Hughes confronted him that night. Ms. Whitfield's testimony indicated that defendant instigated the confrontation by questioning Jeffrey Hughes about his relationship with her. According to Hughes, defendant confronted him, and an argument ensued concerning Ms. Whitfield. Hughes said the physical altercation began when defendant pushed him onto the sofa. Hughes candidly admitted grabbing a gun and striking defendant with it that night. Ms. Whitfield admitted that Willie Nabonne, her guest, started shooting at defendant's uncle, Ricardo Ravey, as he ran. Jeffrey Hughes said Willie Nabonne, armed with the gun Hughes had used to strike defendant, ran after defendant's uncle. Hughes subsequently heard shots outside.
Ms. Whitfield said that on July 7, she heard banging on her window, and looked outside to see defendant, who was holding something in his right hand that she could not identify. There was a futile scramble inside of the house to find the keys to the deadbolt lock so that Ms. Whitfield and her daughter, Jeffrey Hughes, Danielle Brown and Willie Nabonne could escape. Hughes said Danielle Brown and Willie Nabonne made a frantic but unsuccessful attempt to open the lock on the rear kitchen door using a knife to retract the deadbolt. Hughes testified defendant entered the kitchen and opened fire.
Hughes testified that after defendant shot him, Willie Nabonne and Danielle Brown in the kitchen, defendant left the room. Hughes subsequently heard shots coming from outside. Hughes said bullets came in through the back door and hit Willie Nabonne.
Janice Chandler Molere testified that in the early morning hours of July 7, 1993, she heard shooting, and shortly thereafter saw an individual come around the building, *578 reload a gun, and shoot towards Ms. Whitfield's back door.
Defendant cites inconsistencies between Jeffrey Hughes' testimony and his statements to police, as well as Hughes' chronology of events. However, insofar as the issue of credibility, defendant admitted to the jury that he lied to hospital personnel where he went for treatment of the single gunshot wound to his arm that he sustained that night, telling them that he was shot when someone robbed him.
Defendant does not dispute that he shot Willie Nabonne and Danielle Brown to death. He does not dispute that he shot Nabonne fourteen times, Ms. Brown eleven times, and Jeffrey Hughes eleven times. All these acts occurred after he broke into Ms. Whitfield's residence, armed with a twenty-five shot firearm, two days after being beaten and essentially chased from the residence, after he started a fight there with Jeffrey Hughes. Defendant apparently shot the three victims inside of the kitchen, then left the residence, went around outside to the back door, which was to the kitchen, reloaded his twenty-five shot firearm, and then shot into the back door, striking at least Willie Nabonne.
Despite any inconsistencies in Hughes' testimony, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that when defendant shot Willie Nabonne and Danielle Brown, he had the specific intent to kill them or inflict great bodily harm upon them. That Willie Nabonne or Jeffrey Hughes may have shot defendant once in the arm in self defense does not alter this conclusion.
Defendant does not claim that he shot in self defense after being shot first. He suggests that the facts support only a conviction of manslaughter, claiming that fear and panic provoked him to shoot. Defendant likens his case to State v. Lombard, 486 So.2d 106 (La.1986). In Lombard, the defendant's second degree murder conviction was reduced to manslaughter because the deceased stabbing victim confronted the defendant, and the defendant did not unsheath his knife until the deceased punched him, threw him against a metal rail, knocked him to the cement ground, and put the defendant into a stranglehold with the defendant's left arm wrenched behind his back. It was only then, the court said, that the defendant, in a panic, lashed out with his knife. The facts of the instant case are easily distinguished from Lombard.
Manslaughter is defined in pertinent part by La. R.S. 14:31 as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed;....
The Louisiana Supreme Court has explained the relationship between the two separate offenses of homicide and manslaughter as follows:
It is the presence of "sudden passion" and "heat of blood" that distinguishes manslaughter from murder. This court has repeatedly stated, however, that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter. Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than *579 that present when the homicide is committed in the absence of these factors. State v. Lombard, 486 So.2d 106 (La. 1986); State v. Tompkins, 403 So.2d 644 (La.1981). Because they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in "sudden passion" or "heat of blood" is entitled to a verdict of manslaughter. Lombard, 486 So.2d at 111.
State v. Snyder, 98-1078, p. 4 (La.4/14/99), 750 So.2d 832, 837-838.
"Heat of blood" or "sudden passion" is defined in the jurisprudence as provocation sufficient to deprive an average person of his self-control and cool reflection. State v. Miller, 98-642, p. 10 (La.App. 3 Cir. 10/28/98), 720 So.2d 829, 834. However, such provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled or that an average person's blood would have cooled at the time the offense was committed. State v. Collor, 99-0175, p. 10 (La.App. 4 Cir. 4/26/00), 762 So.2d 96, 102, writ denied, XXXX-XXXX (La.3/9/01), 786 So.2d 116. When reviewing the contention, as made by defendant in the instant case, that evidence was produced that the offender committed the crime in sudden passion or heat of blood, the Jackson v. Virginia standard of review must be employed to determine whether a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. Snyder, 98-1078 at pp. 4-5, 750 So.2d at 838. However, defendant need not affirmatively establish the factors; the jury is free to infer the mitigating circumstances from the evidence. State v. Lindsey, 98-1064, p. 5 (La.App. 4 Cir. 6/3/98), 715 So.2d 544, 547.
Viewing the evidence in the instant case in a light most favorable to the prosecution, any rational trier of fact could have found that defendant did not shoot the victims to death because he was in a state of fear and panic, but rather that he shot and killed the victims having the specific intent to kill them or inflict great bodily harm upon them.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2
In this assignment of error, defendant claims that the trial court erred in failing to order an in camera inspection of the grand jury testimony and the district attorney's file to determine whether either contain Brady evidence. Defendant filed a motion on April 25, 2001 for discovery by in camera inspection of the district attorney's file and grand jury transcript. This was five years after defendant's trial and conviction, and one year after this court granted defendant an out-of-time appeal. Defendant requests that this court review the grand jury proceedings. This court is a court of record, and neither the grand jury proceedings or the district attorney's file are included in the record. Defendant must raise this issue by an application for post-conviction relief, where the trial court can review in camera the grand jury proceedings and the district attorney's file, if the court finds such review is warranted.

ASSIGNMENT OF ERROR NO 3
In his third assignment of error, defendant claims that the prosecutor's improper closing argument prejudiced him.
The scope of closing argument "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant." La.C.Cr.P. art. 774. However, *580 prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments that referred to "smoke screen" tactics and defense as "commie pinkos" were felt to be in poor taste, but not so prejudicial as to constitute reversible error). Further, the trial judge has broad discretion in controlling the scope of closing arguments. Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397. Even where the prosecutor's statements are improper, credit should be accorded to the good sense and fairmindedness of the jurors who have heard the evidence. Ricard; supra.
Defendant cites four specific instances of alleged improper argument. First, in response to an objection by defense counsel, the prosecutor stated that defense counsel had objected because he, the prosecutor, was right. The objection had been to the prosecutor's argument that defense counsel wanted to make the jury forget the murdered victims, and portray defendant as the victim. Defense counsel objected on the ground that arguing what defense wanted to do was not arguing evidence. The trial court overruled defense counsel's first objection as to what he wanted to do, but sustained the second objection to the comment as to why defense counsel had objected. The trial court stated that it was an improper remark, and instructed the jury to disregard it.
The second and third instances complained of refer to the prosecutor stating what defense counsel wanted it, the jury, to do. In the portion of the argument to which defense counsel objected to above, the prosecutor commented about what defense wanted to do. As previously mentioned, the defense objected, but the objection was overruled. Later, the prosecutor said that defense counsel wanted the jury to disregard the law. Defense counsel objected, and the trial court sustained the objection.
The fourth cited instance is the prosecutor's comment that defendant had been crying for himself when he cried while testifying. Defense counsel did not object to this comment. Accordingly, defendant cannot complain of it on appeal. La. C.Cr.P. art. 841(A) ("[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."); State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819 (a defendant must make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial).
Crediting the good sense and fairmindedness of the jurors who heard the evidence, it cannot be said that one would be firmly convinced that any of the three comments discussed above influenced the jury and contributed to the verdict.
Defendant next argues that the prosecutor made an improper appeal to emotion in requesting that the jury be permitted to view photographs of the victims, at a point during deliberations when the jury had returned to the courtroom seeking further instructions on manslaughter and second degree murder. The record reflects that the jury foreman, on behalf of the jury, informed the trial court during deliberations that the jury would like to have all of the photographs that were presented as evidence. The jury foreman also asked that the rear door of Ms. Whitfield's residence, which had been introduced into evidence, be brought to the jury room. Lastly, *581 the jury requested a clarification of the definition of the offenses of manslaughter, second degree murder and first degree murder. The record was supplemented, after defendant's brief was filed, with a transcript of the proceeding at which these events transpired. Defendant concedes that his argument in this respect is based on information and belief. Defendant's claim of error is directed to the State's alleged improper actions. As the record clearly shows that the jury requested the photoswith no recorded objection from defense counselthere is no merit to this argument.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 4
In this assignment of error, defendant claims that the mandatory life sentences were excessive. The trial court noted an objection to the sentences on behalf of defendant at the resentencing, where defendant apparently was not represented by counsel. Under these circumstances, defendant has adequately preserved his right to appeal his sentences on the ground of excessiveness.
La. Const. art. I, § 20 explicitly prohibits excessive sentences; State v. Baxley, 94-2982, p. 4, (La.5/22/95), 656 So.2d 973, 977. A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6-7 (La.3/4/98), 709 So.2d 672, 677. Courts have the power under La. Const. art. I, § 20 to declare a sentence excessive, although it falls within the statutory limits provided by the legislature. Id., 97-1906, p. 6, 709 So.2d at 676. When a trial court imposes a sentence in accordance with a carefully tailored penalty statute, such as the statute applicable in the instant case, La. R.S. 14:30.1, there is a strong presumption that the sentence is constitutional. State v. Bunley, XXXX-XXXX, p. 24 (La. App. 4 Cir. 12/12/01) 805 So.2d 292. To rebut the presumption that a mandatory sentence is constitutional, a defendant must clearly and convincingly show that he is exceptional, meaning that because of unusual circumstances the defendant is the victim of the legislature's failure to assign sentences meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. See State v. Lindsey, 99-3256, p. 5 (La.10/17/00), 770 So.2d 339, 343 (mandatory life sentence under the Habitual Offender Law).
Defendant argues that he had no prior criminal record, citing his testimony on direct examination that he did not have any prior felony or misdemeanor convictions. He submits that his "unblemished past" and the circumstances surrounding the "incident" provide a situation where the mandatory life sentence is constitutionally excessive. Defendant's reference to the circumstances of the "incident" is an apparent reference to his claims that on the night of the murders he climbed in the window of Ms. Whitfield's residence intending only to pick up his daughter, that he was armed with a twenty-five shot 9mm firearm only for self defense, because of the occurrences two days earlier, and that he shot Willie Nabonne fourteen times, Danielle Brown eleven times, and Jeffrey Hughes eleven times, from both inside and outside of the residence, pausing to reload, only in a fearful and panicked response to being shot in his arm by someone after he entered the residence. We may infer from the murder verdict that the jury rejected this "manslaughter" version of defendant's defense.
*582 The evidence shows that defendant's culpability was great, the offenses were the gravest of all, and the circumstances were heinous. These factors overwhelmingly outweigh defendant's status as a first offender. Defendant has failed to clearly and convincingly show that the mandatory life sentence for second degree murder provided by La. R.S. 14:30.1 was not meaningfully tailored to his culpability, the gravity of the offense and the circumstances of this case.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 5
In this assignment of error, defendant claims that his trial counsel was ineffective, because trial counsel had a heavy caseload and the demands of the judicial system prevented him from devoting the requisite time to defendant's case. Defendant infers that trial counsel did not properly investigate the case.
"As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted." State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Wessinger, 98-1234, p. 43 (La.5/28/99), 736 So.2d 162, 183; State v. Bordes, 98-0086, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel's performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel's performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel's deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different; "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
Defendant cites no evidence to substantiate the claim that his trial counsel had a heavy caseload. As for trial counsel's failure to investigate, defendant asserts that there are indications that had further investigation been conducted, trial counsel would have discovered that Officer Karen Woods found a .45 caliber handgun on the person of Jeffrey Hughes, and not Willie Nabonne. Officer Woods testified at trial that she was notified at the scene by EMS personnel that one of the persons they were treating had a gun on his person. Officer Woods was asked if she learned the name of that person, and she replied that Ms. Whitfield told her the person's name was "Jeff." This can only be a reference to Jeffrey Hughes. Defendant asserts that "[t]his vital information and many other leads were not explored, as trial counsel could not dedicate sufficient time and resources." The only specific allegation as to a failure to investigate is *583 totally without merit. The other vague and unsupported allegation does not suffice to establish that trial counsel's performance was deficient in any respect, much less that but for any such deficient performance the result of the proceeding would have been different.
There is no merit to this assignment of error.
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] State v. Robinson, unpub., 96-1284 (La.App. 4 Cir. 11/26/97), 704 So.2d 993.
[2] State v. Robinson, 98-0142 (La.5/8/98), 718 So.2d 430.
[3] State v. Robinson, unpub., XXXX-XXXX (La. App. 4 Cir. 4/10/00).