STATE OF LOUISIANA                 *        NO. 2022-K-0145

VERSUS                          *

                                COURT OF APPEAL

JAVAN MARSHALL AND     *

ALFRED WILLIAMS              FOURTH CIRCUIT

                             *

                                STATE OF LOUISIANA

                * * * * * * *

**CONSOLIDATED WITH:**            **CONSOLIDATED WITH:**

**STATE OF LOUISIANA**            **NO. 2022-K-0159**

**VERSUS**

**ALFRED WILLIAMS**

**CONSOLIDATED WITH:**            **CONSOLIDATED WITH:**

**STATE OF LOUISIANA**            **NO. 2022-K-0172**

**VERSUS**

**JAVAN MARSHALL**

APPLICATION FOR WRITS DIRECTED TO
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 423-496, SECTION "J"
Honorable Darryl A. Derbigny, Judge
* * * * * *
**Chief Judge Terri F. Love**
* * * * * *
(Court composed of Chief Judge Terri F. Love, Judge Joy Cossich Lobrano, Judge Dale N. Atkins)

**LOBRANO, J., CONCURS IN THE RESULT**

Jason R. Williams
District Attorney
G. Benjamin Cohen
David B. LeBlanc
Assistant District Attorney
Parish of Orleans
619 South White Street
New Orleans, LA 70119

      COUNSEL FOR RELATOR/RESPONDENT, STATE OF LOUISIANA

Kevin Boshea
2955 Ridgelake Drive, Suite 207
Metairie, Louisiana 70002

AND

Mummi Ibrahim
Ibrahim and Associates, LLC
2714 Canal Street, Suite 201
New Orleans, Louisiana 70119

COUNSEL FOR DEFENDANT/RELATOR, ALFRED WILLIAMS

Justin C. Harrell
1100 Poydras Street, Suite 2900
New Orleans, Louisiana 70163

COUNSEL FOR DEFENDANT/RELATOR, JAVON MARSHALL

**CONSOLIDATED WRIT APPLICATIONS DENIED IN PART; GRANTED IN PART; JUDGMENT VACATED IN PART; AND REMANDED**

**JUNE 15, 2022**

Defendants were convicted and sentenced for their involvement in a shootout with members of the New Orleans Police Department. Both defendants filed applications for post-conviction review. The trial court granted defendants' applications in part, finding that the State of Louisiana committed a *Brady* violation. Defendants' post-conviction claims regarding ineffective assistance of counsel and legality of a responsive verdict were denied.

After review, we find that the State of Louisiana was denied the opportunity to respond to the trial court's allegation that it concealed or distorted the nature of a witness's testimony. As such, that portion of the State's writ application is granted and the matter is remanded for further proceedings. Defendants' writs based on ineffective assistance of counsel for failure to call that same witness at trial are granted and the matters are remanded for further proceedings. Lastly, the writ assertions concerning attempted murder as a responsive verdict are denied, as attempted murder was a valid responsive verdict. Therefore, the consolidated writ applications are granted in part, denied in part, and remanded for further proceedings consistent with this opinion.

## *FACTUAL BACKGROUND*

This Court's opinion on direct appeal set forth the facts as follows:

1

On the night of May 30, 2001, the NOPD was looking for Alfred Williams pursuant to an arrest warrant. The police received information that Williams was riding in a Rollins Cab in the vicinity of Foy Street and Elysian Fields Avenue. Officers Michael Keating and John Barbetti were in the area, and ordered to affect a traffic stop of the cab.

Officers Keating and Barbetti testified that they observed a cab that met the description near the Rite Aid Drug Store on Elysian Fields, and activated the lights on their marked unit. They parked the front end of their unit facing the front of the cab, and exited their vehicle. As Officer Keating approached the driver's side of the cab, he noticed that the driver was holding a gun, and ordered him to drop it. Officer Keating cautioned Officer Barbetti, who by that time was approaching the passenger side of the cab. The front seat passenger fired upon Officer Barbetti, who returned fire. Then, the driver and the rear seat passenger shot at Officer Keating, who fired back twice. As the shooting started, Officer Dan Anderson arrived on the scene, blocking the rear of the cab with his vehicle. The cab backed into Officer Anderson's vehicle, and then pulled forward, knocking Officer Keating to the ground. The suspects fled in the cab toward the river on Elysian Fields with Officer Anderson in pursuit, followed by the unit manned by Sgt. Bryan Lampard and Officer Matthew McCleary.

Ms. Diane Banks, an employee of the Rite Aid store on Foy Street and Elysian Fields Avenue, testified that on the night of the incident she was manning the cash register in the front of the store, near the door. From her vantage point, Ms. Banks saw what she described in her original statement as a dark colored car and a police vehicle drive up to the front of the store from opposite directions. Ms. Banks testified at trial that the car, a yellow cab, stopped, and she saw an arm with a gun extend from the front passenger seat of the cab and begin shooting at the police. As the police fired back, the cab backed up, and sped from the area out of Ms. Banks' line of vision.

Officer Dan Anderson testified that on the night of the incident, he responded to information concerning defendant Williams' presence in the area of the Rite Aid store on Elysian Fields near Foy Street. After Officers Keating and Barbetti stopped the cab in which Williams was riding, Officer Anderson parked his vehicle behind the cab, to thwart escape. As Officers Keating and Barbetti exited their unit, Officer Anderson saw the left front and rear doors of the cab open, and saw two

2

suspects shooting at the police. Officers Keating and Barbetti sought cover, and exchanged gunfire with the suspects in the cab. As the shoot out began, the cab backed up, and rammed Officer Anderson's unit, then veered forward knocking down Officer Keating. The cab fled toward the river on Elysian Fields Avenue. Officer Anderson activated his unit's lights and siren, and pursued the speeding cab. As the chase ensued, the front seat passenger in the cab leaned out of the window, and began to shoot at Officer Anderson. When the cab passed Pleasure Street, Officer Anderson observed the front seat passenger discard a gun, which later proved to be a 9-millimeter Beretta. Officer Anderson radioed dispatch his location, details of the chase and the discarded weapon. Sgt. Bryan Lampard and Officer Matthew McCleary joined in the chase in their marked unit. The cab failed to negotiate a turn onto a side street, hit a tree, and stalled in some shrubbery. Officers Anderson, Lampard and McCleary approached the cab on foot. Defendant Williams exited the front passenger set of the cab, and began shooting at Officers Lampard and McCleary, as he fled on foot. Officers Lampard and McCleary followed Williams in their vehicle, and apprehended him a few blocks from the crash site. Officer Anderson notified other units in the area of the foot pursuit of the fleeing suspects. Officer Anderson and other units arriving on the scene set up a perimeter of the area. In the meantime, the driver of the cab managed to free the cab from the shrubbery, and drive away. The cab crashed, however, into a police unit about a block away. Once other officers secured Williams and Marshall, Officer Anderson retraced the areas of the high-speed chase and initial confrontation to assist in securing the scenes for collection of the discarded weapons. The driver of the cab was transported to Charity Hospital.

Officer Matthew McCleary testified and corroborated Officer Anderson's testimony.

Sgt. Bryan Lampard, the task force commander of the operation to apprehend defendant Williams, testified that he received information from Detective Brazley concerning Williams' status as a wanted person and his presence in the area of Elysian Fields Avenue and Foy Street. Sgt. Lampard set up surveillance of that area. Officer Lampard and Officer Matthew McCleary were stationed at Foy and Frenchman Streets, while Officers Keating and Barbetti were across Elysian Fields at Foy Street. Officer Lampard and his team received word from undercover officers that Williams was in the area riding in a cab. Officers Lampard and McCleary drove around

the block so their marked vehicle would not alert the suspect to police presence. As Officers Lampard and McCleary drove around the block, they heard gunshots. They observed Officers Keating and Barbetti engaged in a gun battle with the suspects in the cab. Officer Lampard radioed dispatch of the situation, and joined Officer Anderson in vehicular pursuit of the cab. Sgt. Lampard's testimony of the facts of the chase corroborated Officer Anderson's testimony. Officer Lampard added that he and Officer McCleary chased Williams by car and foot, apprehending him in a neighborhood yard. Once he secured Williams and returned to the crash scene, Officer Lampard called for medical assistance for the cab driver, who had been shot.

Detective Joseph Catalanotto investigated the incident, and recovered three semi-automatic handguns discarded by the suspects-one .9 millimeter Beretta, one High Point .45-caliber and one Smith and Wesson .10 millimeter.

Officer Theresa Meunier testified that she and her partner Officer Steve Villere participated in the perimeter search of the area into which defendant Williams fled. As she and Officer Villere stood beside their vehicle parked on Benefit Street, she observed a cab approaching at an excessive rate of speed. Unable to stop, the cab crashed into the Meunier/Villere police vehicle. Officers had to break the windows of the cab to unlock the front doors to remove the two occupants. Defendant Marshall, who was seated in the back of the cab, was arrested and handcuffed. Because the driver of the cab was unconscious, and bleeding from a gunshot wound, police called for medical assistance.

*State v. Marshall*, 02-1453, pp. 3-6 (La. App. 4 Cir. 3/19/03), 843 So. 2d 469, 472-74, *writ denied*, 03-1087 (La. 10/17/03), 855 So. 2d 760, and *writ denied*, 03-1101 (La. 10/17/03), 855 So. 2d 760, and *writ denied*, 03-1280 (La. 5/14/04), 872 So. 2d 506.

### *PROCEDURAL HISTORY*

Defendants, Javan Marshall and Alfred Williams,[1] were jointly indicted for

---

[1] Albert Odds was jointly indicted with Defendants on the same charges. However, he was severed from the case and later pled guilty to five counts of accessory after the fact to attempted

five counts each of attempted first degree murder, violations of La. R.S. 14:(27)30.[2]  Mr. Marshall was additionally indicted for possession of a firearm by a felon, a violation of La. R.S. 14:95.1.  Defendants appeared for arraignment and entered pleas of not guilty.  At trial, the jury found Mr. Marshall guilty of one count each of attempted first degree murder and attempted manslaughter (counts three and four, respectively); the jury found him not guilty on counts one and five, and deadlocked on count two, resulting in a mistrial thereon.[3]  The jury found Mr. Williams guilty as charged on counts one, three, and five, and guilty of attempted manslaughter on counts two and four.

The trial court sentenced Mr. Williams to fifty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on counts one, three, and five, to run concurrently.  Consecutive to those sentences, the trial court imposed concurrent sentences of twenty years at hard labor on counts two and four.  The trial court sentenced Mr. Marshall to fifty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence on count three, and twenty years at hard labor on count four, sentences to run consecutively.  The State also filed a multiple offender bill charging Mr. Marshall as a second felony offender, to which he pled not guilty.  The trial court held the multiple bill hearing and adjudicated Mr. Marshall a second felony offender, vacating his sentence on count three, and imposing a new sentence of fifty years imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence, to be served consecutive to the original twenty-year sentence on count

---

first degree murder.  Mr. Odds was sentenced to serve four years imprisonment at hard labor on each count, to run concurrently.

[2] Four of Mr. Williams charges are listed specifically as attempted first degree murder of a police officer, a more specific violation of La. R.S. 14 (27) 30 (2).

[3] Following sentencing, the State entered a *nolle prosequi* on count two, and on the charge of possession of a firearm by a felon.

four.

Defendants filed a joint appeal, and this Court affirmed the convictions and sentences. *Marshall*, 02-1453, p. 15, 843 So. 2d at 479. Defendants filed separate, identical, *pro se* applications seeking post-conviction relief. Then, Mr. Williams filed a counseled application for post-conviction relief (or supplemented his initial application). The State filed procedural objections to the claims contained in Defendants' applications.

Mr. Williams also filed a supplement to his application alleging that he received exculpatory evidence in post-conviction discovery that was not turned over to the defense at trial, namely forensic evidence that had been collected from the vehicle pursuant to a search warrant. Mr. Marshall joined and adopted this supplemental memorandum. The State filed procedural objections to Defendants' (supplemental) claim. Prior to ruling on the State's procedural objections, the trial court held an evidentiary hearing in which witness testimony was taken on March 8, 2018, August 24, 2018, September 18, 2018, October 17, 2019, January 31, 2020, December 20, 2020, and June 22, 2021. In the interim, defense filed a motion to obtain the grand jury transcripts, to which the State filed an opposition.

Mr. Marshall filed a post-hearing memorandum, which included two previously unraised claims, and the State filed its post-hearing memorandum. Defendants filed separate replies to the State's post-hearing memorandum. The trial court ordered the State to produce "for *in camera* judicial inspection, the transcripts and exhibits, and all other relevant documentation associated with the Grand Jury testimony." The trial court issued a written ruling granting Defendants' motion to unseal the jury poling slips; denying Defendants' motion to inspect the grand jury transcripts; granting the State's procedural objections to

Defendants' claims in their initial (*pro se* and counseled) 2004 applications for post-conviction relief; denying the State's procedural objection (as untimely) to Defendants' *Brady* claim; dismissing Defendants' 2021 supplemental claim of Ineffective Assistance of counsel claim for failing to call Renard Price to testify at trial as "previously adjudicated;" dismissing without prejudice Mr. Marshall's 2021 supplemental claims raised for the first time in his post-hearing memorandum; and granting Defendants' *Brady* violation claim on the merits.

All parties noticed their intent to file writ applications. The State filed its writ application (2022-K-0145); Mr. Williams filed his writ application (2022-K-0159); and Mr. Marshall filed his writ application (2022-K-0172). All three parties adopted, and cite to, the same appendix. This Court ordered the consolidation of all three applications for supervisory review.

### POST-CONVICTION HEARING TESTIMONY

#### DEFENSE WITNESSES

#### Joseph Meyer, Jr.

Joseph Meyer Jr. testified that he served as an Orleans Parish Public Defender for thirty years, and was appointed trial counsel for Mr. Marshall for the instant case. Mr. Meyer admitted that, although he had read the trial transcripts, he had no independent recollection of the case, as he "was doing about fifty trials a year then," nor did he recall his defense strategy at trial.[4] He testified that, at the time of trial, the former trial court judge practiced an "informal discovery process" whereby the State was required to turn over exculpatory materials, search warrants, and police reports, but Mr. Meyer would not generally file "formalized motions."

---

[4] Mr. Meyer testified that the extent of his substantive recollection consisted of a car chase, and "a lot of gunfire between both parties."

7

However, due to the complexity of the case, Mr. Meyer stated that he may have either filed formal motions or joined in motions filed by the co-defendants. Without access to the complete record or any independent recollection of the case, Mr. Meyer was unable to determine from the transcript whether he had filed motions or attended hearings, or whether he had knowledge at the time that a search warrant had been issued and/or executed on Defendants' vehicle.

Similarly, Mr. Meyer was neither able to recall nor to determine from the record whether any reference had been made over the course of the case to the return on the vehicle search warrant, which reflected the recovery of 116 fingerprints, seventeen swabs of trace evidence, and several blood samples. When asked specifically whether "any reference [had been] made during the course of trial" . . . "to the latent prints recovered from the vehicle," Mr. Meyer responded, "I don't remember, but probably sure there were." Asked to clarify his response, Mr. Meyer stated, "I don't remember, but I assume there were." Mr. Meyer also testified that without additional context, "it would be hard to say" whether the evidence recovered from the vehicle would have been significant or played a role in his defense strategy. He explained, "an automobile is going to have multiple fingerprints, I would assume, from usage by numerous people…[b]lood samples would have made a little difference if they were of other persons other than the people alleged to be in the car."

On cross-examination, Mr. Meyer confirmed that he could not say one way or the other whether he had received the search warrant return over the course of the case. When asked whether that evidence would have been helpful to his defense in light of the multiple eyewitnesses placing Mr. Marshall inside the vehicle at the scene, where he was subsequently arrested, Mr. Meyer replied, "I

really don't remember even going over the transcript, to be honest with you, I don't remember a lot of the details about the trial itself." Mr. Meyer ultimately opined that if he thought evidence would be harmful to his client, he "would not have gone down that road."

On redirect, Mr. Meyer stated that, based on his experience with the former trial court judge's informal discovery practice, he assumed that the search warrant probably would have been tendered to the defense in discovery, and if he had filed a motion to suppress it, it would be in the record. On re-cross, Mr. Meyer also agreed that he could have "received the search warrant, looked at it, and [] didn't see any issue with it, and [for] some reason [] decided to waive motions."

### *Renard Price*

Renard Price testified that he was present at the scene of the shooting. He testified that several hours prior to the shooting, he had been detained in a traffic stop for failing to use his turn signal, and was subsequently arrested for possession of stolen property after the police investigated the VIN number on the vehicle he was driving. He stated that the officer who arrested him, "Hat back Dan," also ended up involved in the shooting in the instant case. Mr. Price testified that rather than transporting him to central booking, the officer took him to the Fifth District Police Station for an interview. He did not have counsel present.

According to Mr. Price, the interviewing officers had prior knowledge that he was friends with Defendants in the instant case (he stated that the officers knew they "grew up from kids together," although he did not know how the officers obtained that information), and were asking him about crimes that had occurred in the area. Mr. Price stated that the police were "coercing" him to provide information, so he began telling them things "that wasn't even much true," because

he was young and "didn't know any better at that time." More specifically, Mr. Price testified that the police had agreed to let him "go free" in exchange for helpful information. He explained that the police had "just made a bust," which Mr. Price claimed to have seen with his "own two eyes," during which "two kilos of coke with $36,000" had been seized. Mr. Price testified that he was afraid the police would falsely implicate him in the narcotics seizure if he did not cooperate, so he "just went to saying 'yes' to this, 'yes' to that."[5]

Mr. Price testified that the police asked him if he could persuade Defendants to meet up with him and he replied, "Of course I can," so he was transported in an unmarked police unit by a black police officer in plain clothes to Foy Street where he used a pay phone to call Defendants.[6] Mr. Price recalled that he had phoned Mr. Williams, who agreed to meet him at a location off of Elysian Fields. Mr. Price stated that when Defendants drove past the planned meeting location, they did not see him, so they turned around and headed back toward the Rite Aid on the corner of Elysian Fields and Foy. According to Mr. Price, he had a clear view of Defendants' vehicle, and testified that he observed a police officer approach it with his gun drawn, and commanded Defendants to "stop the f-ing vehicle." Mr. Price testified that gunshots were then fired from outside the vehicle and it sped off toward I-610. The officer driving the car Mr. Price occupied pursued Defendants' vehicle to the Elysian Fields overpass "and that was that." Mr. Price recalled nothing more.

Mr. Price explained that he could observe the altercation between

---

[5] Later in his testimony, Mr. Price clarified that he observed the police stuffing the money and the drugs into a plastic bag at the police station, presumably to take to the evidence room. He was not present when the evidence was allegedly seized.

[6] Mr. Price testified that he sat in the front passenger seat of the unmarked police car.

Defendants and the police clearly notwithstanding that it was dark out (around midnight) and he was a block away. He stated that he could hear the gunshots because the car window was "cracked." Mr. Price stated that although he could not see Defendants in the vehicle due to the tint on the window, he knew they were inside because he was told "what [car] they were going to be in" during the phone call. Mr. Price further clarified that he observed the police fire their weapons at Defendants' vehicle, but he did not see Defendants in possession of any firearms, nor did he see any shots fired from Defendants' vehicle from his location.

Mr. Price testified that after the shooting, he was transported back to the police station, then taken to Central Lockup where he was charged with possession of a stolen automobile, although the charge was subsequently dismissed. He was never contacted by any party to testify at trial, nor did he make any effort to contact Defendants or their attorneys prior to trial.

On cross-examination, Mr. Price admitted that he had been convicted several times for possessing a stolen automobile, and he was on probation following a conviction for that offense when he was pulled over and arrested on May 31, 2001. Although the 2001 charge was ultimately dismissed, he was subsequently indicted on an unrelated charge of accessory to second degree murder, resulting in his incarceration with Defendants prior to their trial, though Mr. Price testified that he was on a different tier. Notwithstanding his admitted ability to contact Defendants in jail, Mr. Price conceded that he never notified them, their relatives, or their attorneys, that he was present at the scene and observed only the police officers firing weapons. When the district attorney asked why he had not informed his own attorney at the time, Mr. Price testified that he did, but was told that "that case [did not] have anything to do with" his own case, but they could discuss it if it "come

11

about" in the interim.

*Warren McKenna*

Warren McKenna testified that he represented Mr. Williams at trial, and that he recalled the facts of the case. Mr. McKenna testified that the first time he had seen the search warrant for the vehicle in the instant case was during an interview with post-conviction counsel. He explained how the fingerprints and other evidence found on the vehicle would have been useful in his defense strategy at trial:

> Well, my understanding was that some of the evidence obtained was exculpatory and that it did not identify Mr. Williams, and also the trace evidence that I reviewed, or at least my recollection, was that it did not have evidence of illegal substance or did not have evidence of gunpowder or other residue that was alleged by the state.

Mr. McKenna also testified that he had never spoken to Mr. Price, nor did he "recall being given any information in regards to Mr. Price as it pertains to this matter." Mr. McKenna testified that, at the time of trial, the District Attorney practiced open file discovery, and he could not recall whether he had filed any particularized discovery motions in the instant case.

On cross-examination, Mr. McKenna admitted that he lost his case file in Hurricane Katrina and could not, therefore, compare it to the discovery received during the post-conviction investigation. However, he maintained that he would have introduced the evidence at trial if he had possessed it. Mr. McKenna further acknowledged that although he could not recall his precise defense strategy at trial, he had highlighted the absence of gunpowder discovered on Mr. Williams' in an attempt to show that he had not fired any weapons.

Mr. McKenna testified that the name Renard Price did not "ring a bell," and

he could recall only that the police either spotted Mr. Williams at the drugstore, or received a tip that Defendants would be at the drugstore. Mr. McKenna explained that had his client (Williams) provided "information about Mr. Price and it was exculpatory, [he] would have followed up on it," and, "presumably," would have called Mr. Price as a witness at trial. Mr. McKenna stated succinctly, "I would have talked to him if my client asked me to go speak with him."

### THE STATE WITNESSES

### Dan Anderson

NOPD Lieutenant Dan Anderson testified that he was present at the scene of the shooting and had stopped his police vehicle approximately two yards behind the vehicle Defendants were occupying. He confirmed his certainty that the front seat passenger of that vehicle initiated the gunfire. He did not recall seeing either Officer Brazley or Mr. Price at the scene, although he did recall arresting Mr. Price earlier that day. Lt. Anderson explained that he had observed Mr. Price violating "a couple of traffic laws," so he initiated a traffic stop and discovered Mr. Price had no driver's license or identification, and was driving a vehicle that had been reported stolen. He arrested Mr. Price and took him to the Fifth District Police Station. Lt. Anderson maintained that he was unaware of any friendship or relationship between Mr. Price and either of Defendants, until he later learned from Officers Brazely and Lampert that Mr. Price knew Mr. Williams. Lt. Anderson testified that he had no knowledge of a "drug bust" during which two kilos of cocaine and $36,000 were seized and he did not find Mr. Price's testimony that police officers threatened to frame him for possession of drugs to be credible.

### Calvin Brazley

NOPD Sergeant Calvin Brazley testified that his involvement in the case

13

began when he was notified "by members of the Task Force" that a recent arrestee, Mr. Price, had information pertaining to an unrelated homicide he was investigating at the time. Sgt. Brazley stated that he spoke with Mr. Price at the Fifth District Police Station, who, it turned out, knew nothing about the murder, but could contact the suspect, Mr. Williams. Sgt. Brazley continued, "[Mr. Price] informed me that the individual was riding in a taxicab along with other individuals and they would commit armed robberies."

Sgt. Brazley testified that he rode with another officer, Todd Coleman, in an unmarked police vehicle, with Mr. Price in the backseat,[7] to a payphone near Elysian Fields and the I-610 overpass. From there, Mr. Price called Defendants, fabricated a story concerning an opportunity to commit a robbery, and directed Defendants to his location. Sgt. Brazely then notified other officers in the area "to set up their positions to do the take down," and they backed the vehicle into a parking spot to wait for Defendants to arrive.[8] Sgt. Brazley recalled that when the taxicab drove by shortly thereafter, Mr. Price began "panicking in the back seat saying, "they see us," and ducked down onto the floorboard.

Sgt. Brazley testified that he, Officer Coleman, and Mr. Price then drove around the block in an attempt to follow the taxi, which had continued past them toward Frenchman Street. Sgt. Brazely saw the taxi turn onto Foy Street toward Elysian Fields and then he heard gunshots. He testified that his vehicle had not yet turned the corner onto the street where the shooting occurred so he was unable to

---

[7] This testimony contradicts Mr. Price's testimony that he rode in the front seat of the vehicle, accompanied by only one police officer.
[8] Sgt. Brazely specified that he was in the passenger seat, Officer Coleman was driving, and Mr. Price was in the back seat.

14

see anything.[9]  Once he heard the gunshots, he exited the vehicle and ran around the corner, but the taxicab had already fled the scene, and all he could see were police officers "ducking" and running to their vehicles.  Sgt. Brazley testified that he instructed Officer Coleman, who was still driving the vehicle, to leave the scene to protect Mr. Price, and then he rode with another officer in pursuit of Defendants. At some point during the chase, Sgt. Brazley observed "an individual running on foot through the park, under the bridge toward Allen."  Sgt. Brazely exited the vehicle and gave chase on foot, and "apprehended a Mr. Williams in the back of a house on Allen Street."[10]

Sgt. Brazley denied any knowledge of a drug bust in which two kilos of cocaine and $36,000 were seized, and had never seen, or had any reason to believe, that Lt. Anderson would have coerced a witness to make a false statement.

### Jacque LeBlanc

Former Assistant District Attorney Jacque LeBlanc testified that he was the lead prosecutor in the trial in the instant case.  He testified that he had no specific recollection of the documents that were contained in his case file, but stated that he always practiced "complete open file discovery" and would not have withheld any evidence (except to redact the addresses of witnesses).  He further testified that he would routinely contact the NOPD and confirm that he had been given all of the available evidence in any particular case.

### Paige Cline

Assistant District Attorney Paige Cline testified that she had been trained by

---

[9] In contrast to Mr. Price's testimony that he could see the shooting clearly, Sgt. Brazley testified that from his location when the gunshots were fired, it would have been impossible for anyone in his vehicle to have seen the shooting.

[10] It is not clear whether Sgt. Brazley was the arresting officer, he testified that "we" apprehended defendant.

Mr. LeBlanc in the district attorney's office, and she followed his practice of open file discovery, providing her "whole file except for [her] notes and" witnesses' personal information. Although she had no knowledge of the instant case or any discovery that had been provided, she did not think Mr. LeBlanc would have withheld any evidence.

### *POST-CONVICTION RULING*

At the conclusion of the presentation of evidence and the filing of post-hearing memoranda, the trial court issued a written ruling, which stated pertinently:

> The petitioners' Motion to Unseal Jury Poling Slips is **GRANTED**;
>
> The petitioners' Motion to Inspect Grand Jury Testimony is **DENIED**;
>
> The State's Procedural Objection to Petitioners' 2008 Error Claims under La. C.Cr.P. art. 930.4(A) is **GRANTED**;
>
> The State's Procedural Objection to Petitioners' 2008 Ineffective Assistance of Counsel Claims under La. C.Cr.P. art. 930.4(A) related to trial counsel's failure to cross examine witnesses with questions raised by Petitioners is **GRANTED**;
>
> The State's Procedural Objection to Petitioners' 2008 Ineffective Assistance of Counsel Claims under La. C.Cr.P. art. 930.4(A) related to trial counsel's failure to request a mistrial is **GRANTED**;
>
> The State's Procedural Objection that Petitioners' 2015 *Brady* claim is time-barred under La. C.Cr.P. art. 930.8 is **DENIED**;
>
> The State's Procedural Objection to Petitioner Marshall's 2015 prosecutorial misconduct and cumulative error claims raised in Marshall's *pro se* Application for Post-Conviction relief is **GRANTED**;

16

Petitioners' 2021 Ineffective Assistance of Counsel claims are **DISMISSED** as previously adjudicated by the 4[11][th] Circuit Court of Appeals for the State of Louisiana;

Petitioner Marshall's 2021 claims regarding attempted manslaughter, factual innocence, and false testimony are **DISMISSED WITHOUT PREJUDICE**;

Finally, with respect to the Petitioners' Applications for Post-Conviction Relief, based on the Court's careful review of the entire record of this matter, as well as the Court's *sua sponte* in camera review of the Grand Jury Testimony in this matter, the Court **GRANTS** the relief sought by the Petitioners under the ambit of *Brady v. Maryland*.[12]

## THE STATE'S WRIT APPLICATION (2022-K-0145)

The State asserts in its writ application that the trial court's ruling granting Defendants' *Brady* claim should be reversed, because (1) Defendants, in fact, possessed at trial the evidence they claim the State withheld, and (2) the allegedly withheld evidence was not exculpatory and does not undermine confidence in the verdict. As a secondary argument the State asserts that the trial court erred in granting Defendants' *Brady* claim based on its *sua sponte* inspection of the grand jury transcripts without permitting the State to respond, where Defendants' *Brady* claim was not based on the contents of the grand jury proceedings.

*Supplemental Police Report*

In the 2015 supplement to their post-conviction relief applications,

---

[11] The proper name of this Court is State of Louisiana, Fourth Circuit, Court of Appeal.

[12] Notably, the trial court's ruling from the bench differed slightly. After the trial court denied the first three claims (trial court error in denying motion to enroll new counsel after jury selection began; and two ineffective assistance of counsel claims for (1) failure to cross-examine witnesses; and (2) failure to request a mistrial), the State requested clarification as to whether all of the 2004 claims were being denied procedurally or on the merits. The trial court responded, "Those are denied on the merits." However, the State had only lodged substantive objections to two of the five 2004 claims, and lodged procedural objections to two others (the State failed to address or object to Defendants' first claim of ineffective assistance of counsel for failure to call Mr. Price and Mr. Odds as witnesses at trial.) In the trial court's subsequent written ruling, the trial court stated that it granted the State's procedural objections to each of those same claims.

Defendants contend that the State failed to turn over in pre-trial discovery a forty-six page supplemental police report authored by Detective Catalanotto, which indicated that police acquired a search warrant for the taxicab involved in the shootout, and contained a crime scene report authored by Tarez Smith detailing the evidence seized therefrom: seventeen samples of micro trace evidence; nine blood samples; and 116 partial latent fingerprints. Defendants asserted that during their post-conviction investigation, they learned that the State's original trial casefile was unavailable, and that the supplemental police report that the State turned over in 2011 had been retrieved from the NOPD's homicide casefile. Defendants concluded that the State must have withheld the supplemental report during pre-trial discovery because (1) NOPD crime technician, Tarez Smith, did not testify at trial; (2) none of the parties questioned Detective Catalanotto at trial regarding the search warrant of the vehicle; and (3) no motion to suppress was ever heard.

Defendants further contended that the evidence contained in the report would have been favorable to Defendants because "the defense at trial was that of identity," and because the "evidence and the corresponding test results failed to locate gunpowder residue from inside the vehicle or on any clothing items worn by the defendants," and failed to link Defendants to the firearms recovered in this case.

The day before oral argument on the State's procedural objections, the trial court *sua sponte* ordered the State to produce the grand jury transcripts for an *in camera* inspection. Following oral argument, as the trial court was ruling from the bench, it stated, "As to the *Brady* violations, based upon the court's careful review of the entire record of this matter, as well as the grand jury testimony, the court grants the relief sought by petitioners under the ambit of *Brady vs. Maryland*."

In *Brady*, the Supreme Court held that the suppression by the state of evidence favorable to the accused after receiving a request for it violates due process where the evidence is material either to guilt or punishment, regardless of the intent of the prosecution. *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196-97. Favorable evidence includes that which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 756, 31 L.Ed.2d 104 (1972).

The standard of review on a claimed *Brady* violation is not whether the verdict would more likely than not have been different had the evidence been admitted, but whether in its absence defendant received a fair trial, resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Thus, to constitute a *Brady* violation, a defendant must show that "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *State v. Cambrice*, 15-2362, p. 4 (La. 10/17/16), 202 So. 3d 482, 485-86 (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, (1999)).

In its writ application, the State asserts that the trial record in the instant case reveals that the supplemental police report (containing the vehicle search warrant and the crime scene report detailing the items seized therefrom) was turned over to Defendants in pre-trial discovery.

First, Crime Scene Technician Tarez Smith, who seized the evidence listed above from the taxicab, was on both Mr. Williams' and the State's trial witness

list. It is unclear what testimony Mr. Williams expected Tarez Smith would have provided at trial, other than to discuss the evidence he seized from the taxicab and the contents of the report he authored, considering that appears to have been his sole role in the investigation of this case. Both Defendants would have necessarily been aware that "Tech Tarez Smith" was on the State's witness list.

Second, the prosecutor who tried the case testified at the post-conviction hearing that he practiced open file discovery, and was confident that he turned over all of the evidence to defense in this case, which ADA Paige Cline corroborated to the extent of her knowledge.

Third, during the State's direct examination of Detective Catalanotto at trial, he testified that he obtained a search warrant for the taxicab. Specifically, the State asked the detective if he had seized any additional evidence in the case, and he replied, "At this—what we had done actually, at this scene, we secured this vehicle, we transported it to the evidence cage, and we obtained a search warrant for it so that we could collect further evidence at a later date." Thus, it is clear, at least at that moment, Defendants would have been aware of the search warrant, although neither defendant cross-examined the detective about it. Importantly, during the Defendants' cross-examination of Detective Catalanotto at trial, he admitted that the results of forensic testing of Defendants' clothing revealed no gunpowder residue, and none of Defendants' fingerprints were found on any of the firearms seized. Further, neither of the Defendants' hands had been tested for the presence of gunshot residue.

In addition to the evidence the State points to suggesting Defendants possessed the supplemental police report at trial and had knowledge of the search warrant for the vehicle and the evidence seized therefrom, the trial record reveals a

20

discussion outside of the presence of the jury while cataloguing the State's exhibits following its case in chief. The trial court stated, "S-25 again will be two bullets and one copper jacket. These are test bullets?" The State explained that they were "recovered from the cage." The trial court asked, "You mean like his test cage?" and defense counsel for Mr. Marshall replied, "Cage is when they impound a car, they bring it to--." The trial court then stated, "Oh, inside the car then, that cage." Defense counsel for Mr. Williams also began to explain, "The cage is where they check the cars for—." And the trial court cut in, "Okay. So two bullets and a copper jacket. This is evidence then. This is what comes from a car, correct?" The State confirmed, "Yes."

This conversation suggests that all of the parties in this case, including the trial court, were aware that evidence had been seized from the taxicab after it had been impounded and relocated to the NOPD evidence cage. Moreover, Sgt. Byron Winbush, the firearms examiner who testified at trial, identified the State's exhibit twenty-five as "two bullets and one copper jacket that we recovered from the NOPD cage at headquarters and examined by myself on the same date."

Notably, during the discussion in which Defendants were labeling and filing their exhibits (a continuation of the colloquy addressed above), defendant introduced exhibit D-7 stating, "…as part of [Detective Catalanotto's] report he indicated that Detective Ronquillo did seize from the co-defendant, Albert Odds, certain things while Mr. Odds was in the hospital…" and listed the items of clothing seized. Importantly, contained in the record on direct appeal, is the document defendants introduced as D-7, which contains a heading that is clearly labeled "Supplemental Report-Item E-54148-01." The page footer identified "Homicide Supervisor Sgt. Joseph Catalanotto."

A review of the forty-six-page supplemental police report attached to the State's writ application as Exhibit JA-11, SPE-8, which purports to be the evidence allegedly withheld from Defendants, reveals that Defendants' trial exhibit, D-7, is, in fact, page twenty-one of the forty-six-page supplemental police report the Defendants now claim they never possessed. Moreover, page twenty of the report, the page directly preceding the page introduced as D-7, lists the items of evidence that were recovered during the search of the taxicab conducted at the NOPD cage. The receipt number of the evidence seized from the vehicle and submitted to the NOPD central evidence section (200113723) is actually listed at the top of page twenty-one (Defense Exhibit D-7), as the report was continued over from the previous page.

This suggests that Defendants were, at the very least, in possession of page twenty-one of the supplemental police report they claimed the State withheld, as well as the NOPD receipt number for the evidence seized from the vehicle. It further suggests that Defendants were aware of the existence of the supplemental police report.

Lastly, at the close of trial, the parties entered into a stipulation regarding the forensic report authored by Joseph Tafaro, an expert in the identification and analysis of blood and gunpowder, which listed the specimens he analyzed in this case, and Defendants read the report into the record in the presence of the jury.

The first item listed in the report was seventeen bags of adhesive pads containing micro trace evidence that were "held for reference." The report also listed the items of clothing seized from Defendants and revealed that they tested positive for blood (except the socks), but did not contain evidence of gunpowder. The last item listed in the report was "Nine blood samples," and a note that no

reference samples were submitted for comparisons to the samples seized. Accordingly, it also appears that Defendants (as well as the jury) were aware of the existence of the seventeen bags of micro trace evidence and the nine blood samples they claim the State withheld, and which they claim would have been favorable to their defense.

A review of the present record strongly indicates that Defendants were aware at trial that the police had secured a search warrant for the taxicab; had taken it to the NOPD cage to be searched; and had seized micro trace evidence and blood samples therefrom. The only item Defendants allege that the State withheld that was not expressly discussed at trial, were the 116 partial latent fingerprints lifted from the taxicab, which were listed in the supplemental police report. The trial court minutes from August 21, 2001, and August 30, 2001, in this case expressly provide, "Defense counsel received a copy of the police report and withdrew the motion for a preliminary hearing and all discovery motions," relative to all three co-defendants. Although not dispositive, these minutes entries may supply an alternate explanation as to why no motions to suppress were heard prior to trial, in contradiction to Defendants' contention that, had they possessed the evidence withheld by the State, they would have moved to suppress it.

In support of the State's assertion that the allegedly withheld evidence would not have been favorable to Defendants, the State points out that Mr. Marshall was pulled from the taxicab when he was arrested. Whether forensic evidence failed to connect him to the taxicab would be irrelevant, and not exculpatory. Similarly, eyewitness trial testimony revealed that Mr. Williams exited the taxicab after it crashed into a tree and fled on foot until he was apprehended. For the same reasons, that the evidence collected from the vehicle was not positively matched to

Mr. William's blood, hair, or fingerprints, does not make it any less likely that he was an occupant of the taxicab during the shootout.

The State also points out that the 116 partial fingerprints lifted from the taxicab were classified as unsuitable for identification except for three, two of which matched co-defendant Albert Odds, and one which remained unidentified. Again, it is unclear how Defendants would have utilized this evidence at trial, or how they consider it favorable, or even relevant, to their trial defense strategy. Similarly, the seventeen bags of micro trace evidence were examined only for "hairs, fibers, [and] blood," and even if none of it matched either defendant, eyewitness testimony placed both Defendants inside the taxicab at the scene.[13]

Based on our review, it appears that the State did not withhold the supplemental police report from Defendants at trial, and in any event, the allegedly withheld material does not appear either favorable or material to the defense. It is unclear how the absence of evidence at trial of the 113 partial and unidentifiable fingerprints prejudiced Defendants, let alone operated to deprive them of a fair trial.[14] Based on Defendants' assertions, it appears Defendants have failed to meet their burden of proof on their *Brady* claim regarding the supplemental police report.

### Grand Jury Transcripts and Mr. Price's Testimony

---

[13] In Defendants' writ applications to this Court, they assert that the absence of gunpowder residue found in the taxicab would have been favorable to them, as residue would have been present if weapons were fired from inside the vehicle. However, none of the evidence allegedly withheld, nor any of the other evidence contained in the record, reflects that the interior of the taxicab was ever searched or tested for gunpowder residue, or that the seventeen specimens of micro trace evidence were ever tested for gunpowder residue. According to the record, the only items tested for gunpowder residue were the items of clothing seized from the three co-defendants, and Defendants presented evidence at trial that no gunpowder was discovered on any of Defendants' clothes.

[14] As discussed above, the fingerprint evidence seized from the taxicab was the only evidence not presented to the jury at trial.

The trial court did not enter the grand jury transcript into the record as a sealed exhibit, and provided no substantive reasons for its *Brady* ruling, thus it was unknown what evidence the trial court relied on in finding that the State withheld exculpatory evidence. Thus, this Court ordered the trial court to "produce the grand jury exculpatory evidence under seal" and "file a per curiam regarding the reasoning for granting the Defendants' *Brady* claim."

The trial court's per curiam provided the following:

> This matter came before the District Court on December 15, 2021 for ruling on numerous motions filed by the defense. In advance of Ruling, and to aid in its final decision, the Court ordered *sua sponte* an *in camera* review of the Grand Jury materials kept under seal.
>
> The Court's ultimate decision to grant the Defendants' *Brady* claims rests primarily upon the review of the Grand Jury documents, provided under seal herewith, the Court's review of a 46-page supplemental police report which was not produced at the time of the trial of this matter, attached hereto, and the Court's review of the Evidentiary hearing transcript of Renard Price, attached hereto, which hearing was held years after the trial of this matter, on August 24, 2018.
>
> The Court noted serious and alarming discrepancies between the characterization of Renard Price's involvement in the investigation into the defendants as noted in the supplemental police report (pg. 16 of 46) and the testimony of Renard Price on August 24, 2018. Those discrepancies, along with its *in camera* review of the Grand Jury documents led to (sic) Court to determine that at the time of trial, the State concealed or otherwise distorted the nature of the testimony of Renard Price, a material lay witness to key portions of the events in question, which testimony was at odds with the State's version of events, which denied the jury the opportunity to hear and make its own judgments regarding the veracity of Mr. Price's testimony.
>
> As a result of this apparent deficiency at the Trial of this matter, and in the interest of justice, the District Court granted the Defendants' *Brady* claims on December 15, 2021.

A review of the grand jury transcripts filed in this Court under seal provides

nothing substantive to indicate that the State withheld (or distorted the nature of) exculpatory evidence from the defense. Neither defendant alleged that the State withheld or distorted the involvement of Mr. Price in the investigation. Thus, it is unclear why the trial court granted relief on those grounds. The trial court did not provide any facts or analysis in support of its conclusion, other than citing generally to "discrepancies" between Mr. Price's 2018 post-conviction hearing testimony and the State's "version of events." It is unclear from a review of the per curiam and the grand jury transcripts which factual discrepancies demonstrated that the State "concealed or otherwise distorted the nature of the testimony of Renard Price."

The present record indicates that, prior to trial, Defendants and their attorneys were aware of the details of Mr. Price's involvement in the investigation prior to the shootout, and Defendants acknowledge that all parties learned of Mr. Price's alleged eyewitness account of the incident for the first time in 2018.[15] For example, on February 16, 2002, prior to trial, Mr. Marshall wrote a letter to his father, which provides in part:

> Dad at court today my lawyer let me look through our police report and I found something that mite (sic) be helpful towards us showing and proving our innocence. Remember I told you my friend Renard called us and told us to meet him on Elysian Fields? Well any way while I was reading the police reports I read some statements from Renard. I found out that Renard was already in police custody when he called us. Renard got arrested for a stolen car or something like that and he ask the police, what can he do to help his-self? The police asked what do he mean? He said if there's anything you need to know about the [ninth] ward area I will let you know. Then the police started questioning him about a few things that had

---

[15] As discussed below, in his reply brief Mr. Marshall stated that no parties "anticipated" Mr. Price's testimony that he was an eyewitness to the shooting and that "NOPD officers opened fire first."

been happening in the area. Then they started questioning him about me and Noot. He went to telling them all kind of stuff about me and Noot doing this and me and Noot doing that. Then they asked him if there's any way he can get in touch with us. He said yes I got they (sic) cell phone number. He called us and told us to meet him on Elysian Fields. When we went to meet him the police tried to jam us in. As we stop they started shooting at us.[16]

The supplemental police report at issue also lists Mr. Price first in its section titled "Witnesses and Persons interviewed." His involvement is described therein as follows:

Renard Price, black male, date of birth 08/18/1980, residing 6647 Chef Menteur (sic) Highway, home telephone 248-6530. Renard Price was arrested on Wednesday, May 30, 2001 by Fifth District Police Officers in a stolen vehicle. At the time of his arrest, Renard Price volunteered information regarding the whereabouts of Alfred Williams, who was wanted by authorities. A tape recorded statement was taken from Renard Price by Detective Dwight Deal on Thursday, May 31, 2001 at the Fifth District Police Station. After surrendering the statement Renard Price was taken to Orleans Parish Prison where he was formally charged with possession of a stolen vehicle.

As discussed *supra*, it appears Defendants were in possession of the supplemental police report prior to trial, but in any event, the record indicates that Defendants and their attorneys were fully aware of the details of Mr. Price's involvement in the case leading up to the incident.

Additionally, in Mr. Marshall's *pro se* Application for Post-Conviction Relief, he stated:

Petitioner contends that his counsel were ineffective for failing to use and investigate the facts of his case when he became aware of the report and witnesses. The mentioned police report shown to petitioner early as pretrial motions was a critical document of information

---

[16] It is unclear which police report Mr. Marshall is referring to that his attorney possessed.

27

that could have blown a hole in the state's case, because nothing physical linked the petitioner and all witness testimonies were suspect. Most importantly, Mr. Odds and Price testimonies would have demonstrated to the jury that the petitioner were actually set-up for an ambush. So, the constitution inquiry is why did both counsels decline to use those available avenues?

He stated further, "[trial counsel] knew of these matters and did not pursue them. Mr. Price's testimony and report would have proved beyond doubt that the police intentionally lured the petitioner to the crime scene."

Either way, Defendants were not privy to the grand jury testimony, and whether the State ever flatly denied (or concealed) Mr. Price's brief presence at the scene to Defendants is indeterminable from the record. Notably, at no time during post-conviction proceedings did Defendants claim that the State concealed or distorted any evidence regarding Mr. Price, his testimony, or his involvement in the case, and conceded that the State could not have known the substance of Mr. Price's post-conviction hearing testimony.

Moreover, Mr. Marshall stated in his Reply Brief, "No one could've anticipated that Renard Price would testify that he witnessed the shooting firsthand and that converging NOPD officers opened fire first." He also acknowledged the State's assertion that "Renard Price's testimony at the post-conviction hearing did not exist until that hearing. The NOPD nor the District Attorney's office interviewed him about what he saw that day. The state could not suppress a statement that did not exist." In response, Mr. Marshall stated, "Petitioner is certainly not alleging that the State covered up Price's post-conviction testimony, which was not made and memorialized until he took the stand."

Even if the State had been aware that Mr. Price was in the vehicle with Det. Brazely at the scene, Det. Brazely's post-conviction testimony indicated that their

28

vehicle had not yet turned the corner toward the initial location of the shootout, and thus the first shots fired would not have been visible to the occupants. He also testified that Mr. Price was afraid that Defendants would see him inside the vehicle, so he ducked down onto the floor in the backseat. Further, once shots were fired, Det. Brazely exited the vehicle and ordered Officer Williams (the driver) to return Mr. Price to the police station for his safety. Presumably, Det. Brazely would have related the same information to the State if questioned. On its face, this information appears neither exculpatory nor inculpatory, nor does it appear decidedly material to the defense. Mr. Price admitted during his post-conviction testimony that, despite the ability to contact Defendants in jail, he never informed them, or anyone else, of his presence at the scene, or his alleged eyewitness account.[17] Accordingly, it appears that "the nature" of Mr. Price's testimony remained unknown until 2018, thus, the State could not have concealed or distorted it.

Additionally, because there is no contemporaneous record (Mr. Price was not called to testify at trial), it is unknown whether Mr. Price would have provided the exact same account at Defendants' trial (or in an interview) as he did nearly twenty years later at the post-conviction hearing. Also, without Defendants' trial attorneys' recollections of the details of the case or their respective investigations, it is unknown whether they deliberately chose not to call Mr. Price as a witness because of his credibility issues, as he had been arrested for driving a stolen

---

[17] Mr. Price claimed he informed his own attorney at some point that he had witnessed the shootout, but only after the State asked him on cross-examination why he did not tell anyone, including his own attorney, that he had exculpatory information in the case. Mr. Price explained that he never came forward with his account because his attorney told him to focus on his own case.

vehicle when he informed the police of Defendants' whereabouts, and was in jail for accessory to second degree murder at the time of Defendants' trial.[18]

For these reasons, the present record does not support (and appears to contradict) the trial court's conclusion that the State concealed or distorted the nature of Mr. Price's testimony, and the per curiam does not provide the evidence on which the trial court based its ruling, despite the order from this Court. Accordingly, the present record does not support the conclusion that the State committed a *Brady* violation. However, not only did Defendants fail to prove that the State concealed or distorted the nature of Mr. Price's testimony, they did not even so allege, thus the State was denied the opportunity to respond on the merits based on those grounds. Accordingly, we vacate the ruling and remand for briefing and argument on the trial court's allegation that the State concealed or distorted the nature of Mr. Price's testimony. *See State v. Grant*, 16-0104, p. 4 (La. App. 4 Cir. 8/24/16), 198 So. 3d 1219, 1221-22 (citing *State v. Jackson*, 14-0655, p. 6 (La. App. 4 Cir. 11/26/14), 154 So. 3d 722, 725) (For a trial court to raise a challenge on its own, or to grant relief on grounds other than those asserted in a petition, deprives the parties an opportunity to brief and argue those grounds.).

**MR. WILLIAMS' WRIT APPLICATION (2022-K-0159)**

Mr. Williams' writ application asserts that the trial court erred in denying his claim of ineffective assistance of counsel based on his attorney's failure to discover Mr. Price's alleged eyewitness account of the incident. Mr. Williams asserts that Mr. Price would have provided the same testimony at trial as he did at

---

[18] Considering the defense at trial was "identity," it is also possible that defense counsel declined to call Mr. Price as a witness because he would have confirmed that both Defendants were in the cab and likely possessed firearms, as Defendants believed they were meeting Mr. Price to conduct an armed robbery.

the post-conviction hearing, in which he indicated that he saw the police shoot at Defendants "first," and that Defendants did not fire any shots at the police. Notwithstanding Mr. Williams' contention that the trial court denied this claim, he also contends later in his writ application that the trial court failed to address this claim in its ruling.

In his initial post-conviction relief application filed in 2004, Mr. Williams set forth three ineffective assistance of counsel claims: (1) failure to call Mr. Price or Albert Odds at trial; (2) failure to thoroughly cross-examine the trial witnesses; and (3) failure to move for a mistrial after the State mentioned in its opening statement that the officers involved in the shooting had been cleared of any wrongdoing in an independent investigation.[19]

The State responded with procedural objections, but only addressed the second and third claims of ineffective assistance of counsel,[20] and failed to lodge an objection to the first claim that trial counsel was ineffective for failing to call Mr. Price and Mr. Odds as witnesses at trial. When the trial court issued its ruling as to Defendants' 2004 claims, it addressed the State's objections to each of the claims therein rather than addressing each claim as set forth in the applications for post-conviction relief. Because the State had not lodged an objection to (or addressed at all) Defendants' ineffective assistance claim due to counsel's failure to call Mr. Price and Mr. Odds as witnesses, the trial court failed to include that claim in its ruling addressing the 2004 filings.

On August 26, 2021, following Mr. Price's testimony at the evidentiary

---

[19] The second claim was addressed and rejected on direct appeal. *Marshall*, 02-1453, pp. 9-10, 843 So. 2d at 476.
[20] While the State lodged a procedural objection to the second claim, that it had been thoroughly adjudicated on appeal, the State actually objected to the third claim on the merits.

hearing that he observed the police fire at Defendants first, Mr. Marshall filed his "closing brief," which addressed the following claims: (1) the crime of attempted manslaughter does not exist; (2) the State suborned perjury at trial; (3) trial counsel was ineffective for failing to call Mr. Price as witness at trial;[21] (4) the *Brady* claim; and (5) factual innocence.

In the State's post-hearing memorandum, it responded to the above claims, asserting (a) that all of Defendants' ineffective assistance of counsel claims should be dismissed because this Court found on appeal that Defendants had not received ineffective assistance of counsel at trial, and (b) the rest of the claims (except *Brady*) were not properly before the court, as they were raised for the first time after the evidentiary hearing.

In the trial court's ruling addressing the 2021 claims, it dismissed the ineffective assistance of counsel claim "as previously adjudicated," and dismissed without prejudice the "2021 claims regarding attempted manslaughter, factual innocence, and false testimony."

This ruling is problematic in that the sole appellate claim of ineffective assistance of counsel concerned the failure to thoroughly cross-examine witnesses, *Marshall*, 02-1453, p. 10, 843 So. 2d at 476, the same claim raised in Defendants' 2004 post-conviction relief application, which the trial court properly dismissed as repetitive pursuant to La. C.Cr.P. art. 930.4(A).[22] However, because the 2021 ineffective assistance claim was based on Mr. Price's 2018 evidentiary hearing testimony, it could not have been (and was not) analyzed in this Court's 2003

---

[21] Defendants already had an IAC claim (2004 application) pending for failure to call Mr. Price as a trial witness. However, the 2021 claim is based on Mr. Price's evidentiary hearing testimony that he witnessed the shooting (new evidence), while the initial claim was based on Mr. Price's involvement in luring Defendants to the crime scene.

[22] The trial court granted the State's procedural objection that the claim was barred as repetitive.

32

appellate opinion, and the trial court erred in dismissing the claim on those grounds. Therefore, we vacate the trial court's ruling dismissing Defendants' ineffective assistance of counsel claim for the failure to call Mr. Price as a trial witness, and remand this issue to the trial court for further proceedings.

## MR. MARSHALL'S WRIT APPLICATION (2022-K-0172)

Mr. Marshall's writ application contends that the trial court erred in dismissing without prejudice his claim that the offense of attempted manslaughter, which constitutes one of his convictions, is a logical impossibility and cannot exist, and therefore should be vacated.[23] Mr. Marshall asserts that to be convicted of an attempt to commit a crime, the State must prove that the offender had the specific intent to commit the crime attempted pursuant to La. R.S. 14:27, and that manslaughter, by definition, is an involuntary act for which specific intent could not have been present. Thus, it would be impossible to prove specific intent to do an involuntary act.

The State asserted at the post-conviction hearing that Mr. Marshall failed to raise this claim at any time prior to August 26, 2021, when he asserted it for the first time in his "Closing Brief," despite having knowledge of the responsive verdict of attempted manslaughter since he was indicted. Accordingly, pursuant to La. C.Cr.P. art. 930.4(B), the claim should be dismissed.

La. C.Cr.P. art. 930.4(B) provides that if an application for post-conviction relief "alleges a claim of which the petitioner had knowledge and inexcusably failed to raise in the proceedings leading to conviction, the court shall deny relief."

---

[23] Mr. Marshall also asserts that (1) the trial court erred in denying his claim that his counsel was ineffective for failing to interview Mr. Price and call him as a witness at trial, which duplicates the sole claim in Mr. Williams' writ application addressed *supra*, and (2) offers a "reply" to the State's writ application, defending the trial court's ruling granting Defendants' *Brady* claim, also addressed, *supra*.

"The contemporaneous objection rule has two purposes: (1) to put the trial judge on notice of the alleged irregularity so that he may cure the problem and (2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection." *State v. Thomas*, 427 So. 2d 428, 433 (La. 1982).

In this case, not only did Mr. Marshall fail to timely object to the inclusion of attempted manslaughter as a responsive verdict to allow the trial court to make any necessary correction, he also failed to offer an explanation in his "Closing Brief," where he asserted this claim for the first time, as to why he failed to raise this claim prior to trial, on direct appeal, or in his application for post-conviction relief, or any of his supplements thereto. *See generally State ex rel. Rice v. State*, 749 So. 2d 650 (La. 1999).

It is unclear why the trial court dismissed the claim without prejudice, as it did not issue any reasons for any its rulings. However, while the trial court may have erred in dismissing, rather than denying the claim outright, it does not appear Mr. Marshall would be entitled to relief on this claim in any event.

The Louisiana Supreme Court has long held that the "contention that the element of intent is lacking in the crime of manslaughter is [] without merit," and that attempted manslaughter is a valid responsive verdict for the charged offense of attempted murder. *State v. Harper*, 17 So. 2d 260, 260 (La. 1944); *see also State v. Qualls*, 353 So. 2d 978, 985 (La. 1977); *State v. Williams*, 327 So. 2d 399, 401 (La. 1976).

The *Harper* court explained:

> [A]s expressed in Section 255 of the Fourth Edition of Clark and Marshall's Works on Crimes, "In all cases of voluntary manslaughter there is an actual

34

intention to kill, or there is an intention to inflict great bodily harm, from which such an intent may be implied. It is manslaughter, and not murder, because there is no malice aforethought, not because of any absence or presence of intention to kill."

17 So. 2d at 260-61. Further, La. R.S. 14:32 provides several definitions of manslaughter:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
>
> (2) A homicide committed, without any intent to cause death or great bodily harm.
> (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
> (b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
>
> (3) When the offender commits or attempts to commit any crime of violence as defined by R.S. 14:2(B), which is part of a continuous sequence of events resulting in the death of a human being where it was foreseeable that the offender's conduct during the commission of the crime could result in death or great bodily harm to a human being, even if the offender has no intent to kill or to inflict great bodily harm. For purposes of this Paragraph, it shall be immaterial whether or not the person who performed the direct act resulting in the death was acting in concert with the offender.

Here, only the second and third definition of manslaughter eliminate the element of intent. The first definition contemplates a scenario in which the elements of first or second degree murder are met, but the defendant's actions were

sufficiently provoked to deprive him of his self-control or cool reflection. On its face, this definition does not render a defendant's actions involuntary, nor does it foreclose on the possibility that a defendant acted with specific intent to kill, which can be formed in an instant. *State v. Cousan,* 94-2503, p. 13 (La. 11/25/96), 684 So. 2d 382, 390; *State v. Robinson*, 01-1305, p. 7 (La. App. 4 Cir. 4/17/02), 820 So. 2d 571, 577. [24] Indeed, La. R.S. 14:31(A) specifically states that without provocation (or provocation that occurred far enough in the past that the defendant's blood would have cooled), the defendant's conduct would otherwise constitute first degree murder, which requires the element of specific intent. See La. R.S. 14:30.[25]

The above discussion establishes that the offense of attempted manslaughter is both a valid offense in Louisiana, and a valid responsive verdict to the crime of attempted first degree murder. Consequently, the trial court should have denied his claim either on the merits, or based on his inexcusable failure to raise it in the proceedings leading to conviction. Mr. Marshall's assertion lacks merit.

### *DECREE*

**The State (2022-K-0145)**

While the record does not support the finding of a *Brady* violation, the State was denied the opportunity to respond on the merits based on the alleged concealment or distortion of Mr. Price's testimony. Accordingly, we vacate the ruling and remand for briefing and argument on the trial court's allegation that the State concealed or distorted the nature of Mr. Price's testimony.

---

[24] See La. R.S. 14:10(1) ("Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.").

[25] Second degree murder does not necessarily require specific intent to kill in certain circumstances. La. R.S. 14:30.1.

**Mr. Williams (2022-K-0159)**

For the above-mentioned reasons, the trial court erred by dismissing as repetitive Defendants' ineffective assistance of counsel claims for the failure to call Mr. Price as a trial witness. Therefore, Mr. Williams' writ is granted, the ruling is vacated, and the matter remanded to the trial court for further proceedings.[26]

**Mr. Marshall (2022-K-0172)**

Because the offense of attempted murder is both a valid offense in Louisiana, and a valid responsive verdict to the crime of attempted first degree murder, Mr. Marshall's claim lacks merit. However, as noted above, the trial court erred in dismissing as repetitive Mr. Marshall's claim regarding ineffective assistance of counsel for the failure to call Mr. Price as a trial witness. Therefore, Mr. Marshall's writ is granted in part, the ruling dismissing the ineffective assistance of counsel claim is vacated, and the matter is remanded to the trial court for further proceedings.[27].

**CONSOLIDATED WRIT APPLICATIONS DENIED IN PART; GRANTED IN PART; JUDGMENT VACATED IN PART; AND REMANDED**

---

[26] This includes ineffective assistance of counsel claims that rest upon evidence not previously considered by this Court. *See* La. C.Cr.P. art. 930.8(A)(1).

[27] This includes ineffective assistance of counsel claims that rest upon evidence not previously considered by this Court. *See* La. C.Cr.P. art. 930.8(A)(1).