| | | |
|---|---|---|
| **STATE OF LOUISIANA** | * | **NO. 2025-KA-0097** |
| **VERSUS** | * | |
| | | **COURT OF APPEAL** |
| **NAVARRI R. HENDERSON** | * | **FOURTH CIRCUIT** |
| | * | |
| | | **STATE OF LOUISIANA** |

\* \* \* \* \* \* \*

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 548-104, SECTION "G"
Judge Nandi Campbell
\* \* \* \* \* \*
**Judge Monique G. Morial**
\* \* \* \* \* \*

(Court composed of Judge Karen K. Herman, Judge Nakisha Ervin-Knott, Judge
Monique G. Morial)

JASON R. WILLIAMS
DISTRICT ATTORNEY
PARISH OF ORLEANS

Brad Scott
Patricia Amos
ASSISTANT DISTRICT ATTORNEY
619 S. White Street
New Orleans, LA 70119

     COUNSEL FOR STATE/APPELLEE


Sherry Watters
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, LA 70158

     COUNSEL FOR DEFENDANT/APPELLANT

**CONVICTIONS AFFIRMED;
SENTENCES AFFIRMED AS
AMENDED; REMANDED WITH
INSTRUCTIONS
DECEMBER 30, 2025**

Defendant, Navarri Henderson, appeals his convictions and sentences for first degree rape and aggravated kidnapping of a female victim, J.F., second degree robbery of a female victim, M.F., and domestic abuse battery against a female victim, K.T. Upon review of the appellate record, we find that Defendant's sentence for his second degree robbery conviction is illegal and we amend his sentence to remove the restriction of benefits. We further remand the matter to the district court to impose the statutorily mandated fine in connection with his domestic abuse battery conviction. In all other respects, we affirm Defendant's convictions and sentences.

## STATEMENT OF THE CASE

Defendant, Navarri Henderson, was charged by grand jury indictment with committing first degree rape of a female victim, J.F., in violation of La. R.S. 14:42 (Count One); aggravated kidnapping of J.F. in violation of La. R.S. 14:44 (Count Two); first degree rape of a female victim, M.F., in violation of La. R.S. 14:42 (Count Three); aggravated kidnapping of M.F. in violation of La. R.S. 14:44 (Count Four); robbery of a taser and/or a cell phone and/or a credit card and/or U.S. currency wherein the defendant inflicted serious bodily injury upon M.F. in violation of La. R.S. 14:64.4 (Count Five); domestic abuse battery upon a female victim, K.T., while

K.T. was pregnant, in violation of La. R.S. 14:35.3 (K) (Count Six); and obstructing justice by removing evidence in violation of La. R.S. 14:130.1 (Count Seven). Defendant pled not guilty to all charges.

The matter proceeded to trial on August 19, 2024, with jury selection. During the course of trial, one selected juror was released due to a Covid diagnosis and a second juror, who experienced difficulty enduring the length of trial, was also released on the final day of trial. Two alternates were seated on the jury. Following a four-day trial, the jury returned a verdict finding Defendant guilty as charged of first degree rape and aggravated kidnapping of J.F.; not guilty of first degree rape and aggravated kidnapping of M.F.; guilty as charged of second degree robbery of M.F.; guilty of domestic abuse battery of K.T.; and not guilty of obstruction of justice.

On October 21, 2024, Defendant filed a motion for new trial and a sentencing memorandum and motion for departure below the mandatory punishment, both of which the trial court denied. After Defendant waived sentencing delays, the trial court sentenced Defendant to life imprisonment without the benefit of probation, parole, or suspension of sentence on his first degree rape and aggravated kidnapping convictions; three years imprisonment without benefits on his second degree robbery conviction; and one year imprisonment without benefits on his domestic abuse battery conviction. The court ordered all sentences to be served concurrently. Defendant orally moved the court to reconsider his sentences, which the trial court denied. This timely appeal followed.

## FACTUAL BACKGROUND

At trial, Natalia Carter, a custodian of records at the Orleans Parish Communications District, authenticated three separate 9-1-1 calls received: (1) a December 28, 2016 call reporting an aggravated rape at 700 Patterson Drive in Algiers; (2) an August 1, 2018 call reporting a rape at 3008 Holiday Drive in Algiers; and (3) an October 7, 2018 call reporting a "simple battery domestic" at 3400 Garden Oaks Drive in Algiers.

*December 28, 2016 Crimes*

Officer Marian Mickey testified that at about 9:00 p.m. on December 28, 2016, she responded to a call for service involving a rape in the 700 block of Patterson Drive in Algiers. She testified that upon arrival at the scene, she climbed the levee along the Mississippi River, which she described as "really steep," to reach the riverside of the levee that was very "dark." She used a flashlight and located the victim, J.F., who was lying on the ground between the levee and the river. At the time of Officer Mickey's arrival, emergency medical services personnel and three women who had heard J.F.'s cries for help, were already on the scene.[1]

Linda Hamilton testified that on December 28, 2016, she was at her home in Algiers Point, across the street from the levee. At around 8:30 p.m., she stepped outside to smoke a cigarette and heard a woman, who she later learned was J.F., calling for help. Ms. Hamilton testified that she could hear in the victim's voice that

---

[1] Footage from Officer Mickey's body-worn camera was introduced at trial. After she preserved the scene, Officer Mickey turned the investigation over to the sex crimes unit. Following Officer Mickey's testimony, both parties agreed to a stipulation that crime scene technician Iriona Adams took nine photographs at the scene and prepared a four-page report. The photographs and report were introduced into evidence.

she had been severely injured and needed help. Ms. Hamilton, her best friend, and her daughter walked to the levee to offer help.

Ms. Hamilton testified that they located J.F. lying on the ground on the river side of the levee. She testified that there was a bicycle and walking path at the top of the levee and that the path had motion-activated lighting; however, the area between the levee and the river was very dark and the women had to utilize their phones' flashlights to locate J.F. on the ground. J.F.'s face was bloody and her arm was obviously injured. J.F. told the women that her hip was also injured and that she could not get up the levee due to her injuries. J.F. told Ms. Hamilton that she had been running on the levee when she was attacked by a man who had been sitting on a bench. The man pushed her down the levee as she passed him and then sexually assaulted her. J.F. told Ms. Hamilton that she bit the attacker's penis and that he retaliated by beating her.

Ms. Hamilton testified that her daughter stayed with J.F. while she ran home to retrieve a blanket and water. She testified that the group ultimately decided that J.F. shouldn't drink any water because it could dilute any DNA evidence left by the attacker.

Arkady Hennessy Acosta, a paramedic employed by the City of New Orleans, responded to a call at 700 Patterson Drive on December 28, 2016. She brought a stretcher over the levee and found J.F. lying on the ground with injuries to her right forearm and left hip. She testified that J.F. was in "obvious pain."

Ms. Acosta testified that J.F.'s pelvis was "papoosed" and her right arm was splinted. She was placed on a stretcher and carried up the levee with the help of bystanders.

4

Ms. Acosta also testified that J.F. reported that the assailant forced his penis into her mouth and that she bit his penis. J.F. reported that the assailant choked her, kicked her, and punched her repeatedly. Ms. Acosta stated that J.F. was given intravenous pain medication and taken to University Medical Center.[2]

J.F. testified that in 2016, she ran about two-and-one-half miles a few times a week in her Algiers Point neighborhood. She typically walked from her house to the levee and then would run along the paved path on top of the levee. She would run past the ferry landing, turn, and return home. On December 28, 2016, J.F. went for a run shortly after 8:00 p.m. She ran past the ferry landing and turned around. J.F. testified that as she ran on the levee, she noticed "the shape of a person on a bench…who looked like they were just sitting there staring out at the river." Immediately after she ran past the bench, she felt someone grab her from behind. She tried to get away, but the assailant "pinned" her arms and dragged her down the levee toward the river. He covered her mouth and expressed his intent to rape her. J.F. was "just terrified."

J.F. testified that her assailant was "super strong," and she could not "get free." He told J.F. that he had a gun and would kill her. He dragged her down the levee, close to the water. He pushed her face in the dirt and told her to stop screaming. His hands were around her neck. She tried to pry them from her neck, but she was unable to remove them. In an attempt to persuade the assailant not to rape her, she told him that she had AIDS. The assailant then forced his penis in her mouth. He pushed her head "really hard" and repeatedly called her a "bitch." J.F. testified that she knew the assailant wasn't going to stop, and she remembered

_____

[2] Ms. Acosta prepared a report, which was introduced at trial.

5

having watched a television show where a woman bit her attacker's penis and he stopped the assault. J.F. then bit the assailant's penis and she immediately thereafter felt a "huge blow to [her] face."

J.F. begged the assailant not to kill her and attempted to convince him that he could escape and that she would not report the crime if he let her live. After the assailant left, J.F. tried to get up, but she collapsed. She then tried to crawl, but she was unable. She eventually flipped onto her back and "scooted" toward the levee using her "good" hand and leg. She screamed for help until a man and a group of women arrived to help. J.F. reported that the assailant was wearing a white t-shirt with black markings on it and drawstring shorts; she reported the assailant had shoulder length braids or twists that she recalled slapping onto her face and body during the assault.

J.F. testified that during the assault, her nose was broken and her hip was dislocated. She testified that she continued to suffer from chronic hip pain, mobility issues, neck pain and headaches. J.F. testified that she has had nightmares for years; she believed the assailant was going to kill her and push her in the river to drown.

Jean Holland, a registered sexual assault nurse, testified as an expert in the field of forensic nursing, sexual assault nurse examinations (SANE), sexual assault forensic examinations (SAFE), sexual assault, and trauma. Ms. Holland testified that during sexual assault examinations: the patient is examined; provides a history of the sexual assault; and evidence is collected. Ms. Holland testified that she performed a sexual assault examination of J.F. and collected multiple swabs where

6

she believed J.F.'s assailant could have left DNA.[3] Ms. Holland described J.F.'s demeanor as anxious and tense and noted that J.F. was in "excruciating pain."[4]

Julia Naylor, a DNA analyst employed by the Louisiana State Police Crime Lab, testified as an expert in the field of forensic DNA analysis. Ms. Naylor testified that she received and analyzed samples taken from J.F. and her husband in January of 2017. At that time, the DNA results were entered into the Combined DNA Index System (CODIS) national database and no suspects had been located. Her report, reflecting the analysis of the sexual assault kit taken from J.F., was introduced at trial.

Ms. Naylor testified that in December of 2019, she received DNA samples that were then compared to the DNA results from the December 28, 2016 rape of J.F., and found that Defendant could not be excluded as a contributor to DNA from J.F.'s right fingernail scraping.

Detective Kevin Richardson, a sex crimes detective also assigned to the New Orleans Police Department (NOPD) Cold Case Division, testified that on December 28, 2016, he was notified of a first degree rape that occurred on the levee in the 700 block of Patterson Drive. He met with the victim, J.F., at University Medical Center, where he obtained a statement from her. Detective Richardson testified that the 700 block of Patterson is "right on the Algiers levee and it is a steep levee…and, at that particular time, the water level was kind of low and that area was grassy, but it's very steep down the backside and it's very dark." He testified that he canvassed the

---

[3] Ms. Holland's report was introduced into evidence.

[4] Ms. Holland testified that J.F.'s emergency room diagnosis included a dislocation of her left hip, fracture of her left radius, sexual assault, nasal bone fracture, joint swelling, neck pain, back pain, and gait problems.

area for witnesses and searched for any surveillance that might have captured the assailant.

A manager of an apartment building on nearby Morgan Street told Detective Richardson that he may have captured the assailant on his surveillance camera. Still photographs from the video depicted a black male matching the description provided by J.F. However, the DNA samples obtained from J.F. did not lead to any match in the CODIS system at that time and no suspect was identified.

In September of 2018, Detective Richardson learned that a second sexual assault had occurred in the Algiers area and that the DNA profile obtained from the second victim's sexual assault kit matched the DNA profile from J.F.'s case; however, there was no suspect identified through the CODIS system. On December 23, 2019, Detective Richardson was notified of a CODIS match to J.F.'s rape kit profile. Detective Richardson ran the profile, later learned to be Defendant, through the Thinkstream database, from which law enforcement could access mugshots and Louisiana driver's license information. He learned that Defendant was a black male, six feet to six feet one inch, 168 lbs., with a shoulder-length small twists hairstyle – a description which matched the specific description J.F. provided of her assailant.

Detective Richardson testified that he subsequently searched Defendant's Facebook page. He testified that on the day of J.F.'s assault, December 28, 2016, Defendant posted a photo of himself to his Facebook account. In the photograph, Defendant wore a baseball hat and a white t-shirt with a picture or artwork image of Mahatma Gandhi. In the photo, Defendant had a shoulder-length twists hairstyle. Detective Richardson immediately recognized the outfit in the photograph as the one worn by the individual on the Morgan Street surveillance video. He testified that he then prepared a warrant for Defendant's arrest.

8

Detective Richardson testified that Defendant was arrested in Meridian, Mississippi on January 6, 2020. He acquired a search warrant for Defendant's buccal swab DNA and interviewed Defendant concerning the December 28, 2016 rape.[5] Defendant denied any involvement in the December 28, 2016 rape.

*August 1, 2018 Crime*

Fatima Scruggs testified that on August 1, 2018, she was living in the Rue Parc Fontaine Apartments in Algiers. At about 1:40 a.m. that morning, a young woman beat on her door, screaming for help. Ms. Scruggs called 911 and the woman, M.F., told her she had been raped. She testified that M.F. was "distraught;" she was dirty, had scratches on her neck, and her knees were bleeding.

Francine Brignac, a DNA analyst at the Louisiana State Police Crime Lab, testified as an expert in the field of forensic DNA analysis. Ms. Brignac testified that she received and analyzed samples taken from M.F. in September of 2018. She testified that the results were entered into the CODIS national database. Julie Naylor, another Louisiana State Police Crime Lab DNA analyst, testified that she subsequently analyzed Defendant's DNA profile and compared it to the DNA results obtained by Ms. Brignac from M.F.'s swab samples after the August 1, 2018 rape. Ms. Naylor concluded that Defendant could not be excluded as a contributor to the DNA profile obtained from M.F.'s anal, vaginal, and underwear swabs. Ms. Naylor further testified that there was not sufficient DNA evidence for comparison to the swab from M.F.'s neck.

M.F. testified that on August 1, 2018, she was six-and-one-half months pregnant. On that day, she and a friend took an Uber to the Rue Fontaine Parc

---

[5] A video recording of the interview was played for the jury.

apartment complex and she walked her friend from the car toward her apartment. M.F. returned alone to the area where the Uber driver was supposed to have waited for her, but the driver had left.

M.F. testified that while searching for the Uber driver, she observed a man approach from a porch. He walked alongside her and told her to keep walking and she wouldn't get hurt. M.F. cooperated, believing that he may have possessed a weapon. The man led M.F. behind a dumpster, where he put her in a "chokehold." M.F. testified that she passed out and when she regained consciousness, she was on her stomach. She observed the assailant take her taser, cash, and credit card from her purse. She remained quiet until after the man left, when she ran to the first apartment that she saw.

On cross-examination, M.F. denied having previously met Defendant through a "Backpages ad." She also denied engaging in consensual sex with Defendant at his brother's apartment, and she denied that Defendant physically assaulted her only after a dispute about money in "Cash App."

Sergeant Kenyatta Phillips testified that on August 1, 2018, he responded to a first degree rape call from an apartment in the Rue Fontaine Parc complex. He met with a man and two females at the apartment; one of the females had placed the 911 call and the second, M.F., stated that she was the rape victim. M.F. provided a description of the assailant.[6]

Detective Herman Franklin testified that he responded to a call reporting a first degree rape at 3008 Holiday Drive at 2:00 a.m. on August 1, 2018. Detective

---

[6] Footage from Sergeant Phillips's body-worn camera was introduced into evidence at trial. The parties entered a stipulation that if crime scene technician Ashley Wilson Byers was called to testify, she would testify that she took photographs of the crime scene at the Rue Fontaine Parc apartment complex. The crime scene photographs were introduced into evidence.

Franklin testified that the area was dark and secluded. He searched the area and located a taser in a sewer. The victim, M.F., had been transported to Tulane Lakeside Hospital for a sexual assault exam.[7] Detective Franklin spoke to M.F. at the hospital. M.F. reported that she had been raped. She appeared badly beaten; her eyes were bulging and bloody and her face was swollen.[8]

Sergeant Claudia Bruce testified that she was assigned to the Special Victims Unit, Cold Case Division, which investigates cases a year or older or that may involve serial rapists. Sergeant Bruce testified that she was asked to take over M.F.'s case from Detective Franklin. Sergeant Bruce testified that in 2019, she received a preliminary DNA match from M.F.'s case to Defendant. A photo lineup which included Defendant's photograph was compiled and presented to M.F., but she was unable to identify her assailant. Sergeant Bruce testified that M.F. told her that she never had consensual sex with Defendant and that she did not know him. Based on her investigation, Sergeant Bruce obtained an arrest warrant for Defendant.[9]

Investigator David Benelli testified that he was an investigator with the Orleans Parish District Attorney's Office assigned to the "sexual assault initiative" and assisted in the preparation of cases for prosecution. Investigator Benelli testified that he assisted with the extradition of Defendant from a county prison in Meridian,

---

[7] Elizabeth Marlowe Serpas, an expert in the field of sexual assault and sexual assault examinations, testified that she performed a SANE examination of M.F. Ms. Serpas testified that M.F. reported being strangled and that M.F.'s exam revealed that her mouth and tongue were swollen. Ms. Serpas testified that M.F. reported that her assailant placed his elbow and arm around her neck and "squeezed really hard."

[8] M.F. provided an audio-recorded statement, which was played for the jury.

[9] Following the testimony of Sergeant Bruce, the parties stipulated to the admission of an eight-page report prepared by paramedic India Cross, which reflected that M.F. complained of "being sexually assaulted, choked, and struck to the face" and having lost consciousness.

11

Mississippi. During the January 8, 2020 drive from Mississippi to New Orleans, Defendant told Investigator Benelli that he "wanted to tell them something specifically about the 2018 case." Defendant then provided a recorded statement to Investigator Benelli at the District Attorney's Office, which was played for the jury. In his interview, Defendant stated that he was "familiar" with the 2018 case. He stated that the case involved a "female that he met on Backpage" and to whom he had sent money through "Cash App." He stated that he had consensual sex with her at his brother's house in Algiers. He admitted to taking her credit card and hitting her twice over a disagreement concerning the money allegedly sent on Cash App.

*October 7, 2018 Crime*

Officer Antonio Charles testified that on October 7, 2018, he received a call for service concerning a domestic battery. When he arrived on the scene, he observed that "everything [was] thrown about, all the TV and furniture and stuff." He spoke to the victim, K.T., who appeared injured. He learned that she was pregnant and that a child was present during the assault. K.T. reported that her boyfriend, Defendant Navarri Henderson, with whom she was living, "did this to her."[10]

Following Officer Charles's testimony, the State and Defendant entered into a joint stipulation that Defendant and K.T. were household members as defined under La. R.S. 35:35.3; that Defendant used force or violence on K.T.; that K.T. was pregnant; and that Defendant was aware that K.T. was pregnant at the time of the offense.

---

[10] Officer Charles testified that he wore a body camera while at the Algiers residence; footage from the camera was played for the jury.

Heidi Martin, the forensic coordinator at University Medical Center, testified as an expert in the field of sexual assault, sexual assault forensic exams, forensic exams, and trauma. Ms. Martin testified that she conducted a forensic examination of K.T. She testified that K.T. presented to the emergency department on October 7, 2019, and identified Defendant as her assailant.[11]

## ERRORS PATENT

Prior to reviewing the merits of the appeal, this Court is tasked with examining the record for any errors patent in accordance with La. C.Cr.P. art. 920. The record reflects the following errors patent related to Defendant's sentences that require corrective action:

*Domestic Abuse Battery Conviction*

First, the record reflects that the trial judge failed to impose the mandatory fine required under La. R.S. 14:35.3, which provides:

> C. On a first conviction, notwithstanding any other provision of law to the contrary, the offender shall be fined not less than three hundred dollars nor more than one thousand dollars and shall be imprisoned for not less than thirty days nor more than six months. At least forty-eight hours of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence. Imposition or execution of the remainder of the sentence shall not be suspended unless either of the following occurs:
>
> (1) The offender is placed on probation with a minimum condition that he serve four days in jail and complete a court-monitored domestic abuse intervention program, and the offender shall not own or possess a firearm throughout the entirety of the sentence.
>
> (2) The offender is placed on probation with a minimum condition that he perform eight, eight-hour days of court-approved community service activities and complete a court-monitored domestic abuse intervention

---

[11] Ms. Martin reviewed the emergency department medical records, which reflected that K.T. was treated for "a right zygomatic arch fracture and a left parasymphyseal mandibular fracture." Ms. Martin testified that K.T. underwent surgery to place a metal plate in her jaw. The emergency department records reflected that Ms. Turner presented with right jaw pain after assault to face with unknown object as patient has [loss of consciousness]."

program, and the offender shall not own or possess a firearm throughout the entirety of the sentence.

...

K. Notwithstanding any provision of law to the contrary, if the victim of domestic abuse battery is pregnant and the offender knows that the victim is pregnant at the time of the commission of the offense, the offender, in addition to any other penalties imposed pursuant to this Section, shall be imprisoned at hard labor for not more than three years.

In this case, the trial court sentenced Defendant to serve "one year at hard labor without benefit of probation, parole, or suspension of sentence," but did not impose the mandatory fine. This Court has held that "our circuit is 'constrained to follow the Fourth Circuit's prior jurisprudence directing that we remand for correction of the defendant's sentence where the trial court has failed to impose a statutorily mandated fine.'" *State v. Williams*, 24-0105, p. 8 (La. App. 4 Cir. 10/9/24), 400 So.3d 1194, 1199, quoting *State v. Dorsey*, 20-0029, pp. 4-5 (La. App. 4 Cir. 12/9/20), 312 So.3d 652, 656. Accordingly, because the trial court in this case failed to impose the statutorily mandated fine, we remand this matter to the trial court for imposition of the mandated fine provided in La. R.S. 14:35.3.

*Second Degree Robbery Conviction*

The record reflects that the trial court imposed an illegal restriction on Defendant's sentence for his second degree robbery conviction. La. R.S. 14:64.4(B)(1) provides that, "[w]hoever commits the crime of second degree robbery shall be imprisoned at hard labor for not less than three years and not more than forty years." The statute does not provide for the imposition of a sentence without benefits. The trial court sentenced Defendant to three years at hard labor without the benefit of probation, parole, or suspension of sentence.

14

Accordingly, we amend Defendant's sentence for his second degree robbery conviction to delete the illegal restriction of benefits. The Clerk of Criminal District Court is ordered to transmit the corrected sentencing document to the officer in charge of the institution to which Defendant has been sentenced. *See State v. Sanders*, 04-0017 (La. 5/14/04), 876 So.2d 42.

## LAW AND ANALYSIS

We now turn to address Defendant's assignments of error raised on appeal: (1) the trial court erred in denying two defense challenges for cause during jury selection, in granting the State's challenge for cause as to an alternate juror, and in replacing a principal juror with an alternate juror; (2) the trial court erred in allowing the jury to view, during deliberations, videos of Defendant's statements to officers; (3) the trial court erred in denying Defendant's motion for new trial based on the State's impermissible closing argument; and (4) the trial court erred in denying Defendant's motion for downward departure and failing to consider mitigating factors in imposing a life sentence for his first degree rape and aggravated kidnapping convictions. We address each assignment in turn.

*Assignment of Error Number One*

In his first assignment of error, Defendant claims the trial court abused its discretion in denying his challenges for cause to two prospective jurors. Further, Defendant claims that the trial court abused its discretion in granting the State's challenge for cause as to one prospective juror and in replacing a principal juror with an alternate juror on the fourth day of trial.

In *State v. Bienemy*, this Court addressed juror qualifications as follows:

According to the La. Const, art. 1, § 17 (A), "[t]he accused shall have a right to a full voir dire examination of prospective jurors and to challenge jurors peremptorily." "In trials of offenses punishable by

15

death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant." La. C.Cr.P. art. 799. A party can challenge a juror for cause on the following grounds:

> (1) The juror lacks a qualification required by law;
> (2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
> (3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
> (4) The juror will not accept the law as given to him by the court; or
> (5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

La. C.Cr.P. art. 797.

A reversal of a defendant's conviction and sentence is required if all twelve peremptory challenges are used by a defendant and a trial court's erroneous ruling on a challenge for cause results in the deprivation of one of the defendant's peremptory challenges. *State v. Juniors*, 03-2425, pp. 7-8 (La. 6/29/05), 915 So.2d 291, 304. The deprivation of a peremptory challenge constitutes a substantial violation of their constitutional and statutory rights. *Id.* For Defendant to get a reversal on his conviction and sentence, he must establish that all twelve of his peremptory challenges were exhausted and that the trial court erroneously denied his valid challenge for cause.

23-0271, p. 4, 382 So.3d at 1014-15.

This Court has also stated:

When evaluating a district court's decision to deny a for cause challenge, the "appellate court should accord great deference to the district court's ruling on a challenge for cause, which is necessarily based, in part, on the court's personal observations during questioning." *State v. Mickelson*, 12-2539, pp. 12-13 (La. 9/3/14), 149 So.3d 178, 186-187. The district court is granted broad discretion in ruling on challenges for cause and their ruling will only be reversed if the voir dire record as a whole shows an abuse of discretion. Id. at 187.

*Id.*, 23-0271, p. 5, 382 So.3d at 1015.

16

The basis for the broad discretion afforded to a trial court in ruling on a challenge for cause was discussed in *State v. Dotson*, 16-0473 (La. 10/18/17), 234 So.3d 34. As the Louisiana Supreme Court explained, such a standard of review is utilized "because the trial judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questions by the parties' attorneys." *Id.*, 16-0473, p. 17, 234 So.3d at 45 (citations omitted). "Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record." *Id.*

The Louisiana Supreme Court has recognized that "the line-drawing required of district courts faced with challenges for cause of prospective jurors who give equivocal or contradictory responses during voir dire is complicated and oftentimes daunting." *State v. Mickelson*, 12-2539, p. 12, 149 So.3d at 186. The Court further instructed that an appellate court should "accord great deference to the district court's ruling on a challenge for cause which is necessarily based, at least in part, upon the trial court's personal observations during questioning." *Id.*, 12-2539, p. 12, 149 So.3d at 186-187. Therefore, a trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. *Id.*, 12-2539, pp. 12-13, 149 So.3d at 187.

The record in this case reflects that Defendant exhausted his peremptory challenges. Accordingly, the only issue before the Court is whether a review of the voir dire record as a whole reveals an abuse of the trial court's discretion. *See State v. Bienemy, supra*.

Defendant claims that the trial court abused its discretion in denying his cause challenges of Prospective Jurors 34 and 38. As to Juror 34, Defendant argues that Juror 34's responses during voir dire reflect that she was biased and would not view the parties equally. During voir dire, Juror 34 was asked a series of questions to which she responded that she had been taught to "believe the victim." Defense counsel challenged Juror 34, arguing that she indicated she would believe a victim over any other witness and would be biased. The trial court denied the cause challenge, stating, "No, she didn't say that. She just said that she believes victims." The record reflects that during subsequent questioning concerning the State's high burden to prove guilt beyond any reasonable doubt, Juror 34 responded, "I understand the concept of beyond a reasonable doubt and would follow the law." Considering Juror 34's responses as a whole, we find the trial court did not abuse its discretion in denying Defendant's challenge for cause.

Defendant also contends that the trial court abused its discretion in denying his challenge for cause as to Juror 38, an attorney who disclosed early in voir dire proceedings that he was an acquaintance with a non-testifying witness who was also an attorney. Defendant challenged Juror 38 for cause, asserting that the prospective juror would be biased based on information he may have learned about the case from his acquaintance.

The record reflects that Juror 38 indicated that his attorney-colleague, while discussing other cases the attorneys had together, mentioned that he had been subpoenaed as a witness in a criminal case; however, neither party questioned Juror 38 further to discover what information if any he may have learned about the case. Further, during subsequent questioning, Juror 38 stated that he understood the State's burden of proof in a criminal case that "if the State doesn't prove their case

18

beyond a reasonable doubt, you'd have to find not guilty." Juror 38 also repeatedly indicated that he could follow the law and "look at all of the evidence and weigh the testimony" to reach a verdict. We find that the trial court did not abuse its discretion in denying Defendant's challenge for cause to Juror 38.[12]

On appeal, Defendant further challenges the trial court's decision to replace Principal Juror 11 with an alternate juror on the fourth day of trial. Our review of the record reflects that this issue is not preserved for appeal. The record reflects that an issue concerning Juror 11 arose toward the end of the trial wherein it became apparent that the juror was not engaged or was struggling with being present at trial. After the trial court questioned Juror 11 on the fourth day of trial, the trial court indicated that Juror 11 would be dismissed as he could not handle the "long days" and that he may have "other issues" going on. Defense counsel did not object to Juror 11's removal. Conversely, when discussing Juror 11's replacement, defense counsel agreed and stated, "I think he needs to be gone…he's shaking… ."

Under La. C.Cr.P. art. 841(A), "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." One purpose of this rule is so that "the trial judge can cure the error." *State v. Lanclos*, 07-0082, p. 6 (La. 4/8/08), 980 So.2d 643, 648. Upon review of the record, we find Defendant did not

_____

[12] Defendant also complains that the trial court erroneously granted a challenge for cause to Juror 43 during the selection of alternate jurors, which gave the State an advantage at trial because alternate jurors were ultimately seated on the jury. First, we find that the record reflects Defendant failed to timely object to the granting of the State's challenge for cause as to Juror 43. Under La. C.Cr.P. art. 841(A), "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." One purpose of this rule is so that "the trial judge can cure the error." *State v. Lanclos*, 07-0082, p. 6 (La. 4/8/08), 980 So.2d 643,648. In this case, Defendant did not object to the trial court's ruling until after the jury was sworn in and dismissed. Therefore, this issue is not preserved for appeal. Nevertheless, a review of the record reflects that Juror 43 responded "correct" when questioned whether she "wouldn't be able to adequately consider [a guilty as charged] verdict a possibility" given the mandatory life sentence. Based upon the voir dire record as a whole, the trial court did not abuse its discretion in granting a challenge for cause to Juror 43.

timely object to the removal of Juror 11 but rather agreed with his removal at trial. This issue was not preserved for appeal.

*Assignment of Error Two*

In his second assignment of error, Defendant claims that the trial court committed reversible error when it allowed the jury to view videotaped statements in the courtroom after deliberations had begun. Defendant argues that the statements were testimonial in nature and the jurors' reexamination of the statements during deliberations violated La. C.Cr.P. art. 793.

The record reflects that during deliberations, the jury sent a note to the trial court requesting to reexamine the transcripts of Defendant's statements to Detective Richardson and Investigator Benelli. The trial court responded that it would not allow the jurors to review the written transcripts but would allow the jurors to return to the courtroom and reexamine the videotaped statements in silence.

Initially, neither party objected; however, defense counsel subsequently objected and argued that the reexamination of the evidence was impermissible as it would allow the jury to give undue weight to that limited portion of testimony. The State argued that while the law did not permit the jurors to review the video evidence in the deliberation room, the jury should be permitted to reexamine the requested evidence in the courtroom upon request.

After consideration, the trial court ultimately concluded that the videotaped evidence did not constitute a confession and allowed the jury to return to the courtroom to reexamine or review the two videotaped statements introduced into evidence during trial. Defendant contends the trial court erred in permitting the jury to review the videotaped statements after deliberations had begun. We agree.

However, as discussed below, we find that under the specific circumstances presented herein, that error does not warrant reversal in this case.

La. C.Cr.P. art. 793(A) provides:

> [A] juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.

The Louisiana Supreme Court has addressed the purpose behind La. C.Cr.P. art. 793:

> The policy choice thus represented is to require jurors to rely on their own memory as to verbal testimony, without notes and without reference to written evidence, such as to depositions or transcribed testimony. The general reason for the prohibition is a fear that the jurors might give undue weight to the limited portion of the verbal testimony thus brought into the room with them….

*State v. Perkins*, 423 So.2d 1103, 1110 (La. 1982).

The Louisiana Supreme Court has held that "a trial court has sound discretion in permitting the jury's review of properly admitted evidentiary exhibits during its deliberations, including certain audiotapes and videotapes. *State v. Brooks*, 01-0785, p. 4 (La. 1/14/03), 838 So.2d 725, 728 (wherein the Court found no abuse of the trial court's discretion to allow the jury to view videotaped evidence of the commission of the crime). However, "Louisiana courts have reversed many convictions where the jury viewed a defendant's confession or written statement or re-examined verbal testimony during deliberations." *State v. Johnson*, 97-1519, p. 13 (La. App. 4 Cir. 1/27/99), 726 So.2d 1126, 1133 (citing *State v. Adams,* 550 So.2d 595 (La.1989) (wherein the Louisiana Supreme Court reversed a conviction when the jury reviewed transcripts of the defendant's confession); *State v. Gracia,* 527 So.2d 488 (La. App. 5th Cir. 1988) (wherein the appellate court reversed the defendant's conviction when

21

jury reviewed the defendant's written statements containing inculpatory statements during deliberations).

This Court has addressed the prohibition under La. C.Cr.P. art. 793 and determined that a trial court's violation of La. C.Cr.P. art. 793 is subject to a harmless error analysis.

> Under La. C.Cr.P. art. 921, an appellate court shall not reverse a judgment because of any error "which does not affect substantial rights of the accused." Whether substantial rights of the accused were violated is determined under federal harmless error standards, i.e., whether the guilty verdict in this trial was surely unattributable to the error. *State v. [Silas] Johnson*, 94-1379, p. 14 (La. 11/27/95), 664 So.2d 94, 100, citing *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). *[Silas] Johnson* distinguished between "trial errors," which may be reviewed for harmless error, and "structural errors," which defy analysis under the harmless error doctrine. *Johnson* at p. 14, 664 So.2d at 100, citing *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

*State v. Johnson*, 97-1519, p. 16 (La. App. 4 Cir. 1/27/99), 726 So.2d 1126, 1134.

In this case, during deliberations, the jurors requested to review Defendant's videotaped statements. The trial court did not permit the jury to view the videotapes in the deliberation room but allowed the jury to return to the courtroom in silence to review the two videotaped statements at issue: Defendant's January 6, 2020 statement to Detective Richardson and his January 8, 2020 statement to Investigator Benelli. In the statement to Detective Richardson, Defendant was presented with information concerning the crimes against J.F., and he denied any involvement in those crimes. In the statement to Investigator Benelli, Defendant repeated that he knew "nothing about" the rape of J.F. However, concerning the case involving M.F., Defendant stated that he was "familiar" with the case, that he met M.F. on Backpage.com, and sent M.F. money on a "cash app." Defendant admitted to hitting

22

M.F. twice at the Rue Parc Fontaine apartment complex and to taking her credit card. In his statement to Investigator Benelli, Defendant also admitted hitting his girlfriend, K.T.

We find that the trial court erred in permitting the jury to view the videotaped statements and that such error violated La. C.Cr.P. art. 793. While the statements are not written evidence, the statement specifically to Investigator Benelli qualifies as a confession. Although we find that the trial court violated La. C.Cr.P. art. 793, our analysis does not end there. We are bound by this Circuit's prior jurisprudence, which has held that a violation of La. C.Cr.P. art. 793 is subject to a harmless error analysis. *See State v. Johnson, supra*.

For the reasons discussed below, we find Defendant's convictions were surely unattributable to this error. Notably, we find that under the specific circumstances of this case—where Defendant stipulated to the elements of the domestic abuse battery conviction and further where defense counsel during closing arguments pleaded with the jury to return a guilty verdict on the second degree robbery charge involving M.F.—we find reversal of Defendant's convictions is not required.

Moreover, a review of the record reflects that the evidence of Defendant's guilt for the first degree rape and aggravated kidnapping of J.F. was substantial. The jury was presented with J.F.'s testimony providing a specific description of the assailant; the Morgan Street surveillance video showing Defendant in close proximity in place and time to the crime scene; Defendant's Facebook posting revealing his unique hair style and clothing on the date of the crime; and the presence of Defendant's DNA found on J.F.'s fingernails from her sexual assault kit.

A review of the appellate record also indicates that the evidence of Defendant's guilt of the second degree robbery of M.F. was substantial. During

23

closing argument, defense counsel stated, "[Defendant] takes the credit cards because he's mad at her" and "he hits her and he punches her." The evidence presented at trial demonstrated that Defendant took cash and a credit card from M.F. when he intentionally inflicted serious bodily injury. Finally, a review of the appellate record indicates that the evidence of Defendant's guilt of domestic abuse battery of K.T. was substantial. The testimony of K.T., Officer Charles, and the joint stipulation of the parties are substantial evidence to prove that Defendant struck K.T. while in presence of a child.

Accordingly, we find any error related to the trial court permitting the jury to review Defendant's videotaped statements previously introduced into evidence, under the unique facts of this case, does not constitute reversible error as the verdict is surely unattributable to that error.

*Assignment of Error Number Three*

In his third assignment of error, Defendant claims that the State made certain arguments concerning his guilt for the first time during rebuttal argument, in violation of La. C.Cr.P. art. 774, which provides, in pertinent part, "[t]he State's rebuttal [closing] shall be confined to answering the argument of the defendant."

The State asserts, in its brief, that the defendant failed to timely object to the argument and has accordingly waived consideration of this issue on appeal. The State asserts further that, in any case, the prosecutor's statements were proper rebuttal argument. During the State's rebuttal closing argument, the District Attorney asserted:

> Okay. Let's talk about [J.F.] first. When Detective Richardson was talking to him -- we have that documented on page 20 here -- Detective Richardson tells Navarri, "That's a raping at Algiers Point, a lady jogging on the levee"

They never come back to [J.F.]'s case, but did you catch that? Kevin Richardson said she was grabbed, that's it. "Jogging on the levee, she was grabbed."

Now, two days later, he's got time to think about this, and he asked to speak to make a statement to Dave Benelli. Here's what he says to Benelli when he says, "I have information." He says -- he said -- well, Benelli says, "Now the case of 2016, what did the detective tell you about the case of 2016?"

Henderson says, "He said that it was a lady jogging on the levee and she was dragged to the back of the -- close by the Mississippi River."

Kevin Richardson didn't tell him that. He said she was grabbed, not that she was dragged down by the Mississippi River water. He knew because he's the one that did it.

The record reflects that Defendant did not make any objections during the entirety of the State's rebuttal argument. The trial transcript reflects, "STATE'S REBUTTAL CLOSING CONDUCTED WITHOUT OBJECTION". Defendant's claim concerning the State's rebuttal argument was first raised in his motion for new trial.

Under La. C.Cr.P. art. 841 (A), "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence." Defendant has waived any claim based on prosecutorial misconduct with respect to rebuttal argument. *See* La. C.Cr.P. art. 841; *State v. Robinson,* 01-1305, p. 14 (La. App. 4 Cir. 4/17/02), 820 So.2d 571, 580. This Court has found that "[t]he contemporaneous objection rule exists, not only so that a trial judge may correct the error at the time it is made, but it also serves notice in the record that the complained of conduct was so noticeable as to create prejudice in the minds of the jurors." *State v. Allen*, 12-1757, p. 12 (La. App. 4 Cir. 10/9/13), 126 So.3d 675, 683 (citing *State v. Taylor,* 91-2496, p. 5 (La. App. 4 Cir. 3/29/94), 635 So.2d 416, 420). Here, as noted above,

Defendant failed to contemporaneously object to any of the prosecutor's statements in rebuttal argument. Accordingly, this claim has been waived.

*Assignment of Error Number Four*

In his final assignment of error, Defendant challenges his three-year sentence for his domestic abuse battery conviction, asserting that it exceeds the statutory limits by requiring that it be served without parole, probation, or suspension of sentence. He further challenges his mandatory life sentences for his first degree rape and aggravated kidnapping convictions, contending that the sentences are constitutionally excessive.[13] For the following reasons, we affirm Defendant's sentences for those convictions.

*Domestic Abuse Battery Sentence*

The sentencing mandates for a domestic abuse battery conviction are provided in La. R.S. 14:35.3(C):

> On a first conviction, notwithstanding any other provision of law to the contrary, the offender shall be fined not less than three hundred dollars nor more than one thousand dollars and shall be imprisoned for not less than thirty days nor more than six months. At least forty-eight hours of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence. Imposition or execution of the remainder of the sentence shall not be suspended unless either of the following occurs:
>
> (1) The offender is placed on probation with a minimum condition that he serve four days in jail and complete a court-monitored domestic abuse intervention program, and the offender shall not own or possess a firearm throughout the entirety of the sentence.
>
> (2) The offender is placed on probation with a minimum condition that he perform eight, eight-hour days of court-approved community service activities and complete a court-monitored domestic abuse intervention

---

[13] Defendant also assigned as error that his sentence for his second degree robbery conviction exceeds the statutory limits because the sentence was ordered to be served without benefit of parole, probation, or suspension of sentence. This issue is discussed *infra* in the Errors Patent discussion of this opinion.

program, and the offender shall not own or possess a firearm throughout the entirety of the sentence.

Moreover, Section K of the statute further provides:

> Notwithstanding any provision of law to the contrary, if the victim of domestic abuse battery is pregnant and the offender knows that the victim is pregnant at the time of the commission of the offense, the offender, in addition to any other penalties imposed pursuant to this Section, shall be imprisoned at hard labor for not more than three years.

Louisiana Revised Statute 14:35.3(K) provides that the penalty set forth is "in addition to any other penalties imposed pursuant to this Section." Louisiana Revised Statute 14:35.3(C) provides, "At least forty-eight hours of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence." Louisiana Circuit Courts of Appeal have considered the benefits provisions of La. R.S. 14:35.3(C) and held that restricting benefits is authorized by the statute. In *State v. Simon*, the First Circuit held that "[t]he restriction of parole . . . is authorized by La. R.S. 14:35.3(M)(1), and thus, the sentence legally restricts parole." 22-0726, p. 14 (La. App. 1 Cir. 12/22/22), 360 So.3d 528, 540. In *Simon,* the Court considered subsection M(1), which provides "Notwithstanding any provision of law to the contrary, if the domestic abuse battery is committed by burning, the offender, in addition to any other penalties imposed pursuant to this Section, shall be imprisoned at hard labor for not more than three years." In holding that the statute authorized restricting benefits, the First Circuit reasoned:

> That statute provides that the penalty set forth is "in addition to any other penalties imposed pursuant to this Section." La. R.S. 14:35.3(C) provides, "[a]t least forty-eight hours of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence." See *State v. Ard*, 2020-221 (La. App. 5th Cir. 4/28/21), 347 So.3d 1046, 1060 (failure to restrict parole when imposing enhanced sentence for domestic abuse battery by strangulation, a violation of La. R.S. 14:35.3(L), required remand for resentencing "with instructions to the district court to impose defendant's enhanced sentence in accordance

with the provisions of the underlying statute, La. R.S. 14:35.3(C), as it relates to the restriction of parole").

*Simon*, 22-0726, p. 14, 360 So.3d at 540.

Likewise, we find that the statutory language "in addition to" should be interpreted to permit a restriction of benefits as set forth in La. R.S. 14:35.3(C) for the mandatory three-year sentence provided under subsection K that applies when the victim is pregnant and the offender knew the victim was pregnant at the time of the offense. Thus, Defendant's sentence is legal. This assignment is without merit.

*First Degree Rape and Aggravated Kidnapping Sentences*

Next, Defendant challenges his mandatory life sentences for his first degree rape and aggravated kidnapping convictions. Specifically, he asserts that the trial court failed to consider his age, lack of criminal history, mental health history, and history of childhood sexual abuse in imposing life sentences. Defendant argues that he is entitled to a downward departure from the mandatory life sentence under *State v. Dorthey*, 623 So.2d 1276 (La. 1993).

This Court has addressed an excessive sentence claim in the context of the imposition of a mandatory minimum sentence:

> The Louisiana Constitution guarantees that "[n]o law shall subject any person to ... cruel, excessive or unusual punishment." That protection allows the judicial branch to determine whether the range of sentences authorized by a criminal statute is excessive for a particular defendant.[3] The court must start with the presumption that a mandatory minimum sentence is constitutional. In order to rebut that presumption, a defendant must clearly and convincingly prove that he is exceptional. This Court has articulated that exceptional "means that because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case."

> If the mandatory minimum sentence is constitutionally excessive then a downward departure is required under *Dorthey*. "A punishment is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the

purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime." A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.

*State v. Green*, 17-0520, p. 3 (La. App. 4 Cir. 11/15/17), 231 So.3d 756, 758 (footnotes omitted).

"The trial judge is afforded wide discretion in determining sentences, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed." *State v. Bradley*, 18-0734, p. 8 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 99-100 (quoting *State v. Williams*, 15-0866, pp. 12-13 (La. App. 4 Cir. 1/20/16),186 So.3d 242, 250). An appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La. C.Cr.P. art. 894.1 and whether the sentence is warranted under the facts established by the record. *State v. Wiltz*, 08-1441, p. 10 (La. App. 4 Cir. 12/16/09) 28 So.3d 554, 561. However, even where there has not been full compliance with La. C.Cr.P. art. 894.1, resentencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. *State v. Stukes*, 08-1217, p. 25 (La. App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250 (citing *State v. Major*, 96-1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So.2d 813, 819).

During the sentencing hearing, Dr. Sarah Deland, a forensic psychiatrist, testified that Defendant had been diagnosed with bipolar disease and was treated with anti-psychotic medications. She testified that his mother was addicted to heroin during her pregnancy with him and that he grew up in a violent environment. The record reflects that Defendant was subjected to childhood physical and sexual abuse.

The victim, J.F., testified that the assault was "the first thing [she thought] of when [she woke] up and the last thing [she thought] of when [she went] to bed." She

29

testified, "It's always with me, and I fear it always will be." J.F. testified that at the time of the assault, she was an architect who worked long hours and going for a run on the levee was one of her favorite things to do after a long day. She testified that she has not run alone since the assault. J.F. testified that she believed she would die that night. She testified that the assault has impacted every aspect of her life; since the assault, she has enrolled in a graduate program at Tulane University to advocate for crime victims.

J.F.'s husband testified that after the assault, he and his wife had to move from the neighborhood they loved. J.F. had nightmares every night and woke up crying. He testified that J.F. suffered from post-traumatic stress disorder and extreme anxiety. Due to the assault, she suffered "a lifetime of mental and physical trauma." Finally, he testified, "[b]oth my wife and I have had our lives forever changed by this attack. He's taken away both of our lives. We will never be the same."

At the conclusion of the sentencing hearing, the trial court stated:

> Mr. Henderson, considering the sentencing guidelines laid out by Louisiana Code of Criminal Procedure, Article 894.1, the facts of the case, the seriousness of the crimes, and the impact those crimes have had on the survivors, I hereby sentence you as follows. As it relates to count one, first degree rape, life at hard labor without the benefit of parole, probation, or suspension of sentence. As it relates to count two, aggravated kidnapping, life at hard labor without the benefit of parole, probation, or suspension of sentence.[14]

Upon review, we find no abuse of the trial court's discretion in denying Defendant's motion. The record reflects that the trial judge did consider the sentencing guidelines provided under La. C.Cr.P. art. 894.1 and the evidence presented at trial supports the mandatory sentences imposed. The evidence at trial reflects that Defendant brutally attacked J.F. as she ran past him on the Mississippi

---

[14] Defendant orally moved for reconsideration of his sentence, which the trial court denied.

River levee. He dragged her to the river's edge, pinned her down, and pushed her face in the mud and dirt to prevent her from screaming before he raped her. As a result of her assault, J.F. suffered a broken nose, arm, and hip, and was left to suffer, unable to pull herself up the levee, in the dark and cold and scream for help. At the time of trial, J.F. still suffered from chronic hip pain, mobility issues, neck pain, and headaches.

The record in this case does not reflect that the trial court abused its broad discretion when it sentenced Defendant to the mandatory life sentences for first degree rape and aggravated kidnapping. This assignment is without merit.

## DECREE

For the reasons provided herein, we affirm Defendant's convictions. We affirm Defendant's sentences for his first degree rape and aggravated kidnapping convictions. We amend Defendant's sentence for his second degree robbery conviction to delete the imposition of benefits restrictions, and order the Clerk for the Criminal District Court to transmit the corrected sentencing document to the officer in charge of the institution in which Defendant has been sentenced. We further remand this matter to the trial court to resentence Defendant for his domestic abuse battery conviction to impose the statutorily mandated fine.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED AS AMENDED; REMANDED WITH INSTRUCTIONS**